DETROIT EDISON COMPANY v PUBLIC SERVICE COMMISSION

Docket Nos. 177054, 177055, 177062, 177064, 177163, 177164. Submitted March 5, 1996, at Lansing. Decided February 7, 1997, at 9:05 A.M.

Detroit Edison Company, subject to a moratorium on increases in electrical rates until December 31, 1993, pursuant to a settlement agreement in Public Service Commission Case No. U-8789, filed on July 1, 1992, an application with the commission for an increase in electrical revenues of $82.5 million annually from January 1, 1994, to December 31, 1996. Several parties intervened in the proceeding. The commission reduced Detroit Edison's rates and charges for electricity by $78,025,000 and made determinations concerning the deferral of 1993 pension costs until 1994, the R10 and D8 tariffs (reduced rates) for large industrial users of interruptible power, and Detroit Edison's demand-side management program. Intervenors Ford Motor Company and others and Detroit Edison appealed, and their appeals were consolidated.

The Court of Appeals *held*:

1. The decision of the Public Service Commission to allow Detroit Edison to defer until 1994 the 1993 pension costs of $3,028,000, incurred as a result of the adoption of the accrual basis specified by Statement of Financial Accounting Standards 106 of the Financial Accounting Standards Board, was not unlawful or unreasonable, did not violate the settlement agreement in Case No. U-8789, and did not constitute retroactive ratemaking.

2. The commission's decision to increase R10 capacity by 650 Mw, subject to reduction for customers who refuse requested interruptions in power, was not unlawful or unreasonable.

3. The commission did not act unlawfully or unreasonably in maintaining D8 capacity at a maximum of 150 Mw and allowing the expiration of the "buy-through" provision under which customers could avoid power interruptions by paying Detroit Edison a small premium. Given the circumstances of this case, the commission did not act unreasonably or unlawfully in refusing to consider the claim of intervenors Ford Motor Company and Chrysler Corporation that D8 was discriminatory. The commission's decisions regarding D8 involved issues of rate structure, and the Court of Appeals will not disturb the commission's decisions in the absence

of a showing that the decisions were arbitrary, capricious, or represented an abuse of discretion.

4. The commission did not exceed its authority to establish rates in authorizing a demand-side management program for industrial and commercial customers. The fact that MCL 460.6c; MSA 22.13(6c) provides for conservation programs such as demand-side management for residential ratepayers does not mean that the commission is without authority to approve or require similar programs for industrial and commercial ratepayers. The commission, however, impermissibly infringed on Detroit Edison's managerial prerogatives in modifying the demand-side program proposed by Detroit Edison. The commission's power to fix and regulate rates does not include the power to make managerial decisions. The commission's error concerning the demand-side management program does not require a refund to customers. To the extent that customers have been charged for the program, the charges represent rates based on expenses that the commission has found just and reasonable. Further consideration by the commission of the demand-side management program is to take place on remand only if deemed necessary by the commission.

Affirmed in part, reversed in part, and remanded.

*Thomas A. Hughes* and *Bruce R. Maters*, and *Fischer, Franklin & Ford* (by *George Hogg, Jr., Pat D. Connor*, and *Sidney M. Berman*), for Detroit Edison Company.

*James P. Ziety*, and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting, P.C.* (by *Harvey J. Messing* and *Michael J. Oliva*), for Ford Motor Company.

*Michael W. Grice*, and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting, P.C.* (by *Harvey J. Messing* and *Michael J. Oliva*), for Chrysler Corporation.

*Walter H. Makupson*, and *Verner, Liipfert, Bernhard, McPherson & Hand, Chartered* (by *Clinton A. Vince, J. Cathy Fogel*, and *MaryLou Lundin*), for General Motors Corporation.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Donald E. Erickson,* Assistant Attorney General, for the Attorney General.

*Honigman Miller Schwartz and Cohn* (by *Daniel J. Demlow* and *Richard J. Aaron*), and *Brickfield, Burchette & Ritts, P.C.* (by *Foster De Reitzes* and *Philip L. Chabot, Jr.*), for North Star Steel Company.

*Honigman Miller Schwartz and Cohn* (by *Daniel J. Demlow* and *Richard J. Aaron*), for AutoAlliance International, Inc.

*Hill Lewis* (by *Robert A.W. Strong* and *John M. Ketcham*), for Association of Businesses Advocating Tariff Equity.

*Don L. Keskey, David A. Voges,* and *Patricia S. Barone,* Assistant Attorneys General, for the Public Service Commission.

Before: MARILYN KELLY, P.J., and WAHLS and M. R. KNOBLOCK*, JJ.

PER CURIAM. These six appeals arise from a January 21, 1994, decision of the Michigan Public Service Commission (PSC) and the PSC's June 16, 1994, decision on rehearing in a general rate case initiated by Detroit Edison Company on July 1, 1992. PSC No. U-10102. Detroit Edison sought a rate increase, effective January 1, 1994, of about $82.5 million annually for 1994 through 1996. Detroit Edison asked for additional increases during the course of the proceeding. Numerous parties intervened. The PSC concluded that Detroit Edison's rates should be reduced by $78,025,000. These appeals concern several aspects of the PSC's decision. There is considerable overlap in the arguments of the appellants, particularly concern-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

ing the PSC's exercise of authority regarding a "demand-side management" (DSM) program requested by Detroit Edison.

The standard of review for PSC orders is narrow and well established. MCL 462.25; MSA 22.44 provides that all rates, fares, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Michigan Consolidated Gas Co v Public Service Comm*, 389 Mich 624; 209 NW2d 210 (1973); *Attorney General v Public Service Comm*, 206 Mich App 290, 294; 520 NW2d 636 (1994). An appellant must show by "clear and satisfactory evidence" that the order of the PSC complained of is "unlawful or unreasonable." MCL 462.26(8); MSA 22.45(8); *Michigan Consolidated Gas Co, supra* at 639; *CMS Energy Corp v Attorney General*, 190 Mich App 220, 228; 475 NW2d 451 (1991); *Attorney General, supra* at 294. Courts should not substitute their judgment for that of the administrative agency on a factual issue and must defer to the PSC's administrative expertise. 206 Mich App 294; 190 Mich App 228.

The PSC is a creature of the Legislature, and its authority must be found in statutory enactments. *Union Carbide Corp v Public Service Comm*, 431 Mich 135, 146; 428 NW2d 322 (1988); *In re Quality of Service Standards*, 204 Mich App 607, 611; 516 NW2d 142 (1994). Ratemaking by the PSC is a legislative function. *Detroit Edison Co v Public Service Comm*, 127 Mich App 499, 524; 342 NW2d 273 (1983). The PSC is not bound to follow any particular method or formula when it determines rates. *Michigan Bell Telephone Co v Public Service Comm*, 332 Mich 7, 36; 50 NW2d 826 (1952). Also see *Consumers Power Co v Public Service Comm*, 181 Mich App 261, 269; 448

NW2d 206 (1989), and *Attorney General v Public Service Comm*, 157 Mich App 198, 205; 403 NW2d 467 (1986). The determination of just and reasonable rates requires a determination of the reasonable costs of doing business. *General Telephone Co v Public Service Comm*, 341 Mich 620; 67 NW2d 882 (1954); *Detroit Edison, supra* at 524.

### SFAS 106

The PSC allowed Detroit Edison to recover in 1994 $3,028,000 of accrued retirement benefits that were deferred from 1993. This cost arose because of a December 1990 change in the generally accepted rules of accounting for the cost of postretirement benefits. These rules were changed by the Financial Accounting Standards Board in its Statement of Financial Accounting Standards (SFAS) 106. SFAS 106 requires companies to account for postretirement benefits on an accrual basis during the working lives of their employees. The accounting change was effective for fiscal years beginning after December 1992. SFAS 106 permits companies to amortize the transitional costs over twenty years, such costs including the costs for previous years of employment when there had been no accrual of postretirement benefits. These costs were around $50 million for Detroit Edison.

In 1992, the PSC initiated its Case Nos. U-10040 and U-10040A to decide how to handle these postretirement costs for utility companies (including Detroit Edison). The PSC determined that SFAS 106 should be followed for ratemaking purposes, but the PSC permitted utilities to defer SFAS 106 accruals for up to three years. The PSC decided U-10040 on December 8, 1992.

Consistent with the decision in U-10040, Detroit Edison deferred its SFAS 106 accrued costs until 1994 and amortized its costs over nineteen years. Permitting Detroit Edison to defer 1993 costs to 1994 was within the broad power of the PSC to regulate utility rates. Costs recognized in 1993 under SFAS 106 were not recognized for utility ratemaking purposes until 1994.

The PSC is entitled to consider "all lawful elements" in determining rates. MCL 460.557; MSA 22.157 and MCL 460.6h(1)(d); MSA 22.13(6h)(1)(d). The PSC is not bound by any single formula or method and may make pragmatic adjustments when warranted by the circumstances. *Michigan Bell Telephone Co, supra* at 36-37; *Attorney General v Public Service Comm*, 189 Mich App 138, 148; 472 NW2d 53 (1991); *Midland Cogeneration Venture Ltd Partnership v Public Service Comm*, 199 Mich App 286, 314; 501 NW2d 573 (1993). The PSC has discretion to determine what charges and expenses to allow as costs of operation. *Michigan Bell Telephone Co, supra; Detroit Edison, supra* at 524. What reasonable accounting method to employ is a legislative decision to be made by the PSC. *Attorney General v Public Service Comm #1*, 171 Mich App 696, 698; 431 NW2d 47 (1988). The PSC is expressly empowered to prescribe uniform methods of keeping accounts. MCL 460.556; MSA 22.156.

In this case, the PSC treated Detroit Edison in the same fashion as other utilities. For ratemaking purposes the expenses under SFAS 106 did not have to be recognized in 1993. Given the circumstances, which included a change in accounting rules that had to be implemented over time, permitting Detroit Edison to

begin amortizing the expenses in 1994 was not unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8).

Nor did permitting the deferral for ratemaking purposes of SFAS 106 costs that could be attributed to 1993 violate a settlement agreement reached in Case No. U-8789, the previous general rate case of Detroit Edison. Included in the settlement that closed that case was a moratorium on rate increases through the end of 1993. The fact is that Detroit Edison did not increase rates in 1993 in violation of the moratorium. Any increase in Detroit Edison's 1993 expenses that was caused by SFAS 106 was absorbed by Detroit Edison and was not passed on to ratepayers. U-8789 did not preclude consideration in future rate cases of any particular cost item, and U-8789 did not control future accounting decisions.

The PSC's treatment of the SFAS 106 costs did not constitute retroactive ratemaking. Retroactive ratemaking, which is prohibited, involves a change either upward or downward in the rates charged by a utility for its service under a lawful order. *Attorney General v Public Service Comm*, 206 Mich App 297 (1994). Ratemaking orders are prospective in effect. *Michigan Bell Telephone Co v Public Service Comm*, 315 Mich 533, 547; 24 NW2d 200 (1946). The PSC's decision in this case concerning SFAS 106 expenses did not alter the rates charged in 1993. The 1994 rates were based upon 1994 expenses, one of which was the deferred 1993 SFAS 106 expense permitted by U-10040.

### R10 TARIFF

The R10 tariff is a special, discounted rate for large industrial customers who agree that Detroit Edison can interrupt their power service under certain cir-

cumstances. A principal reason for having inter-
ruptible power is to control peak demand for power
and thereby eliminate the cost of building additional
generating capacity (a cost to all ratepayers) needed
only in times of peak power demand. The R10 tariff
was first permitted by the PSC in U-10090, a case that
commenced and concluded during the five-year mora-
torium on Detroit Edison's rates under U-8789.
Detroit Edison was permitted to offer R10 service up
to a maximum usage or capacity of 400 Mw. Condi-
tions associated with R10 service included one that
the customer had to commit to a contract term of
eight years (which could be terminated only by five
years' written notice, which notice could not be given
until after the third year of the contract) and a condi-
tion that the service be specially "metered" at each
customer's location.

Detroit Edison requested an increase in its R10
capacity to 650 Mw by 1995. There was evidence that
the R10 tariff was popular with Detroit Edison's cus-
tomers and that the metering requirement was bur-
densome. The PSC approved a capacity increase to 650
Mw by 1995 and eliminated the need for special
metering. But the PSC added a condition or "penalty"
that required a reduction in the amount of R10 power
a customer would be permitted to receive equivalent
to the amount of power the customer refused to inter-
rupt when requested to do so.

Numerous parties asked the PSC to reconsider the
penalty provision. The PSC denied rehearing on this
point, concluding that its penalty provision was realis-
tic and would not cause unintended adverse conse-
quences because there was every reason to believe
that if some customers were penalized, the capacity

used by those customers could readily be assigned to other customers.

We view the penalty or "capacity reduction clause" in the R10 tariff as part of the structure of the R10 tariff. As such, the safeguard in the form of the capacity reduction penalty is presumed to be lawful and reasonable, MCL 462.25; MSA 22.44, until it is shown by clear and satisfactory evidence that it is not, MCL 462.26(8); MSA 22.45(8). No such showing has been made. There is no indication that there was not more than ample demand for the 650 Mw authorized by the PSC, and therefore the penalty was not unreasonable. This Court will not interfere with the PSC's decisions on matters of rate structure. *Colony Park Apartments v Public Service Comm*, 155 Mich App 134, 138; 399 NW2d 32 (1985); *Attorney General v Public Service Comm #2*, 133 Mich App 790, 798-799; 350 NW2d 320 (1984); *Detroit Edison, supra* at 524. The changes in the R10 service ordered by the PSC did not undermine the purpose behind the tariff. Rather, there has been no showing that the R10 tariff as structured by the PSC in this case is unlawful or unreasonable.

## D8 TARIFF

### A

Included in the overall rate structure approved by the PSC were 150 Mw of capacity under a D8 tariff. D8 is an interruptible service available to industrial and other large customers at a discounted rate. D8 was first approved in 1976 in U-4807. Detroit Edison unsuccessfully requested on several occasions that a "buy-through" or "purchase power" provision be added to the tariff and that D8 be capped. By December 1987 customers were using 135 Mw under the D8

tariff, with General Motors Corporation having contracted for about 70 Mw of that capacity. Detroit Edison closed the tariff. The settlement in Detroit Edison's previous general rate case, U-8789, approved a capacity cap of 135 Mw for D8 and, for the first time, a buy-through provision. That provision permitted customers to avoid power interruptions by paying Detroit Edison the cost of and a small premium for replacement power Detroit Edison purchased elsewhere, if such power were available. U-8789 also incorporated an existing severe penalty, but the buy-through provision made it possible to avoid a power interruption as well as the penalty. Customers found D8 attractive enough that in a fairly short time they contracted for the total capacity of 150 Mw.

In this rate case, Detroit Edison asked for changes in D8, but asked that the 150-Mw capacity cap be maintained. Appellants Ford Motor Company and Chrysler Corporation intervened to pursue the "limited issue" of increasing the interruptible capacity available under D8 so that they could purchase power on a more competitive basis vis-à-vis their principal competitor, General Motors. They sought to have the capacity cap on D8 either increased to 250 Mw or removed entirely.

The PSC maintained the 150-Mw capacity cap on D8, noting that at the same time it had increased interruptible capacity under R10. The PSC decided, however, to let the buy-through provision expire by its terms on January 1, 1994. The PSC declined to consider Ford and Chrysler's argument that D8 was discriminatory because it was not and had never been available to Ford or Chrysler on the terms approved by the PSC (which included the buy-through provi-

sion). The PSC did not find it necessary to consider this discrimination claim in light of the fact that it had decided to let the buy-through provision expire.

In response to several motions for rehearing, the PSC concluded that "unintended consequences" might result from its decision to let the buy-through provision expire and the PSC therefore reinstated the provision. The PSC nevertheless still did not consider Ford and Chrysler's discrimination claim. Instead, the PSC suggested that the claim could be raised "in the more usual manner through a complaint."

B

We reject the argument that it was mandatory for the PSC to consider the particular discrimination claim in this case in the course of deciding the general rate case before it. It was not necessary for the PSC to resolve the discrimination claim, under the circumstances of this case.

The principal authority offered for the proposition that the PSC had no choice but to decide the discrimination claim is *Colony Park Apartments, supra.* This Court noted in passing in *Colony Park Apartments* that the PSC's elimination of "grandfathered rate disparities appears mandated by the nondiscrimination statute, MCL 460.557; MSA 22.157." 155 Mich App 137. However, the decision in *Colony Park Apartments* had nothing to do with the quoted remark and the remark was dicta. In *Colony Park Apartments,* the PSC terminated the use of residential rates by numerous multiunit dwellings that had used that rate before a rate distinction was made between duplexes and larger multiunit dwellings. The PSC eliminated the disparity, and this Court noted its approval. This Court

did not hold that every discrimination issue must be resolved in every general rate case.

While the better practice might be to consider discrimination claims in the course of a general rate case, here the discrimination claim came to the fore late in the proceeding. The initial focus of the intervening parties advancing the claim was to increase the available D8 capacity. Indeed, their request to intervene was for that limited purpose, albeit their discrimination argument was at least implicit. But the discrimination argument did not become their main argument until the PSC changed its mind on rehearing and reinstated the buy-through provision. At that point this rather massive case was more than two years old, six months of the three-year period the case concerned had already elapsed, and the bulk of this general rate case had been resolved. Under these circumstances we do not find that the PSC acted unreasonably or unlawfully in leaving the discrimination claim for a separate complaint. We note that such a complaint has been filed.

C

The PSC's decisions to cap D8 power at 150 Mw and to include a buy-through provision are challenged on appeal. Both of these issues are matters of rate structure that are legislative in nature and that this Court will not disturb absent a showing that the decisions are arbitrary, capricious, or an abuse of discretion. *Great Lakes Steel v Public Service Comm*, 130 Mich App 470, 480; 344 NW2d 321 (1983). These are not factual issues. *Colony Park Apartments, supra*, at 138.

The buy-through provision was not arbitrary or capricious. The provision had existed for five years and the rate was apparently successful, with Detroit Edison and its customers desiring it. This Court has no basis upon which to find an abuse of discretion in continuing the provision.

Similarly, establishing a capacity cap of 150 Mw was not arbitrary, capricious, or an abuse of discretion. The PSC considered the arguments of all parties and explained why it imposed a cap. The PSC recognized the threat to the utility and to customers who did not participate in the discounted rate if the capacity cap were increased too much. The PSC also noted that interruptible power was made more available by its increase in R10 capacity. As a matter of rate structure, the PSC was well within its authority to determine a limit on interruptible D8 capacity. The 150-Mw cap was a line drawn in the process of developing the rate structure. There has been no showing that the point at which the line was drawn was unreasonable.

D

Detroit Edison argues that Ford and Chrysler should be estopped from objecting to the D8 buy-through provision and capacity cap because Ford and Chrysler agreed to the same provisions through their membership in the Association of Businesses Advocating Tariff Equity (ABATE), which approved the settlement in U-8789. Ford and Chrysler never sought reconsideration in or appealed from the decision in U-8789. Judicial estoppel precludes a party from adopting a legal position in conflict with a position taken earlier in the same or related litigation. The doctrine protects the integrity of the judicial and

administrative processes. *Michigan Gas Utilities v Public Service Comm*, 200 Mich App 576, 583; 505 NW2d 27 (1993). Here, while Ford and Chrysler were members of ABATE, they were not and are not the same party as ABATE. Detroit Edison has not presented authority indicating that Ford and Chrysler are precluded from taking a position different from the position taken by ABATE in previous litigation.

### DEMAND-SIDE MANAGEMENT (DSM)

### A

Demand-side management is "the planning and implementation of activities designed to influence customer use of electricity in ways that will produce changes in the time pattern and magnitude of a utility's load." *ABATE v Public Service Comm*, 205 Mich App 383, 386; 522 NW2d 140 (1994). Such programs attempt to affect the demand for power and in theory can lessen the need to construct additional utility plants, thereby lowering the cost of power to all ratepayers. Detroit Edison asked for a rate increase of about $55 million for the years 1994 through 1998 for a proposed demand-side management program. The rates sought for the first three years of the program totaled $27.5 million.

Detroit Edison's proposed DSM program applied to small and average industrial and commercial customers. In another proceeding, Detroit Edison sought a DSM program for low-income residential customers. Detroit Edison's large industrial customers apparently were little interested in a DSM program. Detroit Edison's detailed proposal included a package of thirty-three separate DSM measures. Detroit Edison proposed a rate surcharge on the class of customers

who were involved in the program. Detroit Edison also proposed a "shareholder incentive" of twenty percent of the savings realized by the program.

The PSC "approved" Detroit Edison's "proposed base DSM spending levels for 1994 through 1996." Almost immediately after stating its approval, however, the PSC found that $14 million more than requested by Detroit Edison for the three-year period should be "made available" for the program because of the "likelihood that more cost-effective DSM exists." The PSC authorized Detroit Edison to collect from its customers $41.5 million for the 1994-96 period for the DSM program. In addition, the PSC adopted capacity savings of 171 Mw rather than the reduction of 123 Mw proposed by Detroit Edison. The PSC also approved a reduction of 256,000 Mwh rather than the 167,000 Mwh planned by Detroit Edison. The PSC eliminated a "dispersed generation" measure Detroit Edison had included in its proposal. The PSC reasoned that the measure, which involved customers supplying their own energy at times, did not reduce or shift a customer's use of electricity.

The PSC also approved surcharging all customers on the basis of a uniform rate, rather than surcharging only customers involved in the DSM program as proposed by Detroit Edison. In addition, the PSC changed a "lost revenue" provision proposed by Detroit Edison. Although the PSC permitted Detroit Edison to recover revenue lost because of the DSM program, the PSC imposed two limitations on that recovery. The PSC did not permit recovery if Detroit Edison's sales exceeded projections used in the ratemaking process or if Detroit Edison earned more than its authorized rate of return. With respect to the proposed "share-

holder incentive," the PSC reduced the maximum shareholder benefit to fifteen percent of the savings from the DSM program. And the PSC added a penalty of up to fifteen percent if Detroit Edison did not achieve the approved spending and energy saving levels approved by the PSC.

B

It is argued on appeal that the PSC exceeded its authority in authorizing rates to cover Detroit Edison's DSM program. While it is true that the PSC has only those powers granted to it by the Legislature, *Union Carbide Corp, supra* at 146; *In re Quality of Service Standards, supra* at 611, setting rates for the cost of a DSM program is nothing more than the fixing of rates, which is a principal function of the PSC. MCL 460.551; MSA 22.151, MCL 460.557; MSA 22.157. The PSC may consider "all lawful elements" in determining rates, including costs. MCL 460.557(2); MSA 22.157(2), MCL 460.6a(2); MSA 22.13(6a)(2). We find nothing unlawful regarding the costs associated with the DSM program. The program is directly related to power supplied by Detroit Edison. The ratemaking process requires a determination by the PSC of what utility costs and expenses are reasonable and prudent. The PSC made such a determination here, and its determination deserves judicial deference.

The fact that MCL 460.6c; MSA 22.13(6c) provides specific authority to develop energy conservation programs for residential customers (as opposed to industrial and commercial customers) does not imply that the PSC has no authority to establish rates on the basis of similar programs for industrial and commercial customers. MCL 460.6c; MSA 22.13(6c) is permis-

sive and it does more than merely authorize ratemaking based upon a DSM program. For example, it authorizes an energy conservation loan program for residential customers, permits an energy conservation program for residential customers only, requires the promulgation of rules to establish standards for such programs, and requires certain measures to be included in such programs. The PSC's involvement under MCL 460.6c; MSA 22.13(6c) exceeds traditional ratemaking, and consequently, the express authority provided by MCL 460.6c; MSA 22.13(6c) is necessary. In contrast, in the instant case the PSC purports only to establish rates based upon a DSM program proposed by Detroit Edison. As did this Court in *ABATE*, *supra* at 389, we reject the argument that the PSC may not authorize rates based upon the reasonable costs of a DSM program on the ground that the only statute specifically authorizing approval of energy conservation programs, MCL 460.6c; MSA 22.13(6c), is limited to residential ratepayers.

C

A more difficult question is whether the PSC impermissibly infringed on Detroit Edison's managerial prerogatives because of the manner in which it approved rates for Detroit Edison's DSM program. The PSC's power to fix and regulate rates does not carry with it, explicitly or implicitly, the power to make managerial decisions. See *Union Carbide Corp*, *supra* (the PSC could not order a utility to cease operation of a particular power plant that the PSC found to be uneconomical, although the PSC did not have to approve rates based upon expenses it found to have been uneconomical), *Consumers Power Co v Public*

*Service Comm*, 189 Mich App 151, 179; 472 NW2d 77 (1991) (the PSC could not control what "qualifying facilities" a utility transacted business with under a federal statute and the PSC could not require a utility to enter into any particular contract), and *General Telephone Co, supra* at 634-638 (the PSC exceeded its jurisdiction in requiring a telephone company to reduce the number of subscribers attached to a single line). The PSC's power to regulate a public utility does not include the power to order the utility to follow particular principles of economic management. 431 Mich 151.

Detroit Edison sought an increase in rates on the basis of a detailed, proposed DSM program. The PSC "approved" the program, but in doing so the PSC modified Detroit Edison's proposal. The PSC's modifications included, among other things, authorizing Detroit Edison to spend $14 million more than Detroit Edison planned to spend in the first three years of the program, establishing targets for capacity and usage reduction based upon spending the additional $14 million, and imposing a financial penalty on Detroit Edison if the targeted reductions did not occur. These modifications effectively imposed a DSM program of the PSC's own design. The PSC decided the level of the program, eliminated certain aspects of the program proposed by Detroit Edison, and decided the savings that should be produced by the program. These were managerial decisions that exceeded the PSC's authority. *Union Carbide, supra* at 148-151. Even the residential programs authorized by MCL 460.6c; MSA 22.13(6c) are programs developed by a utility management and then possibly "approved" by the PSC. The PSC here exceeded its ratemaking authority by, in effect,

requiring Detroit Edison's management to adopt the DSM program the PSC thought best. The PSC did significantly more than "approve" the DSM program proposed by Detroit Edison.

For authority to approve the DSM program in the instant case, the PSC relied upon its previous decision in another case, U-9346, in which the PSC approved a DSM program for Consumers Power Company. The PSC further justified its decision on the basis that this Court sustained its decision in U-9346 in *ABATE*, *supra*.

It is not clear that the DSM program approved in U-9346 was inconsistent with the decisions of the utility's management or was opposed by that management. This Court affirmed the decision of the PSC on the grounds that ABATE had no standing and that the issue was moot because all parties (except ABATE) had settled on implementing a DSM program. *ABATE*, *supra* at 387-388. This Court's subsequent discussion of the merits of ABATE's arguments was dicta. Although that discussion indicated approval of the PSC's actions, this Court did not have before it an appeal brought by the utility itself and it is not clear that this Court was faced with a PSC decision imposing a financial penalty if the utility failed to achieve targets exceeding what the utility management thought was appropriate.

In its brief, the PSC argues that its rate decision regarding the DSM program is supported by *Attorney General v Public Service Comm #2, supra*. In that case this Court affirmed a "System Availability Incentive Provision" (SAIP) that included both incentives and penalties. The SAIP was intended to encourage Detroit Edison to improve the availability of its elec-

tric generating units. We do not find the decision persuasive authority for purposes of this appeal. The case did not involve an appeal by utility management, the case was decided before *Union Carbide, supra,* and the decision in part incorrectly viewed MCL 460.6; MSA 22.13(6) as an express grant of authority (compare 133 Mich App 796 and 431 Mich 147).

D

Although we conclude that the PSC erred in the manner in which it "approved" Detroit Edison's DSM program, no refund to customers is necessary or appropriate. To the extent customers have been charged for the DSM program, the charges represent rates based upon expenses the PSC has found just and reasonable. MCL 462.25; MSA 22.44, MCL 462.26(8); MSA 22.45(8). There is nothing invalid about the DSM program per se. The error here is that the PSC impermissibly interfered with utility management decisions.

There are numerous additional arguments raised regarding "modifications" the PSC imposed on Detroit Edison's DSM proposal. We view these arguments (including the length of the program, which customers should pay for the program, and recovery for lost revenues) as being matters of rate structure. We see no reason not to defer to the PSC with regard to these matters. *ABATE, supra; Colony Park Apartments, supra* at 138; *Attorney General #2, supra* at 798-799. Finally, to the extent we have not addressed specific issues raised by the several appellants, we believe those issues need not be addressed in light of our decision.

DISPOSITION

This matter is remanded to the PSC for further consideration, to the extent the PSC deems it necessary, of the PSC's decision with respect to the DSM program. We are cognizant that the DSM program has been the subject of further proceedings before the PSC in U-10671, but that proceeding does not necessarily make the instant appeal moot because that proceeding did not affect rates for 1994. In all other respects the decision of the PSC is affirmed.

Affirmed in part, reversed in part, and remanded.