ATTORNEY GENERAL v PUBLIC SERVICE COMMISSION

Docket No. 242743. Submitted January 20, 2004, at Detroit. Decided July 1, 2004, at 9:05 A M. Leave to appeal sought.

The Attorney General intervened at the Michigan Public Service Commission (PSC) to object to the accounting and ratemaking treatment of unusually large storm-related expenses incurred by The Detroit Edison Company in 1997. Initially, the PSC had issued an ex parte order allowing Detroit Edison to amortize a portion of those extraordinary expenses in 1998, partially offsetting previously ordered larger rate reductions. While that order was pending at the Court of Appeals, the PSC authorized a similar offset of the remainder of the storm-damage, extraordinary expenses in 1998. In an unpublished opinion per curiam, the Court reversed, holding that even though the net effect was a rate reduction, such an offset against previously ordered rate reductions is, in effect, a rate increase, and remanded the case to the PSC for notice and hearing on the rate increase as required by MCL 460.6a(1) (Docket No. 207993). On remand, the Attorney General argued that, with this accounting technique, Detroit Edison was implementing a rate increase in 1998 on the basis of costs incurred in 1997, constituting impermissible retroactive ratemaking. Detroit Edison argued that the PSC had adopted the Uniform System of Accounts, which includes the use of deferred cost accounting for extraordinary property losses such as the 1997 storm losses. The PSC ordered that the accounting action was allowed, concluding that deferred cost accounting allowing rate recovery amortization is not retroactive ratemaking because ratepayers are charged for the amortization expense when it occurs, that is, at the date to which it was transferred from an earlier date. The Attorney General appealed.

The Court of Appeals *held*:

The Public Service Commission order at issue is neither unlawful nor unreasonable, and the PSC did not exceed the scope of authority by permitting the use of deferred cost accounting for the amortization of storm-related expenses pursuant to the Uniform System of Accounts, Account 182.1, Extraordinary Property Losses. Because the rates to be changed were for 1998 and 1999,

and because the requests for changes were timely submitted in 1997, the changes were future rate changes, not retroactive rate changes.

Affirmed.

PUBLIC UTILITIES — ELECTRIC UTILITIES — RATES — EXTRAORDINARY PROPERTY LOSSES — AMORTIZATION.

The amortization of extraordinary property losses by a public, electric utility pursuant to Account 182.1, Extraordinary Property Losses, of the Uniform System of Accounts adopted by the Public Service Commission is not retroactive ratemaking if timely requested (1999 AC, R 460.9001).

*Michael A. Cox*, Attorney General, and *Theodore E. Hughes, J. Peter Lark*, and *Donald E. Erickson*, Assistant Attorneys General, for the Attorney General.

*Clark Hill PLC* (by *Roderick S. Coy, Haran C. Rashes*, and *Michael P. Calabrese*, Special Assistant Attorneys General), for the Public Service Commission.

Before: O'CONNELL, P.J., and WILDER and MURRAY, JJ.

PER CURIAM. The Attorney General appeals as of right an order issued by the Michigan Public Service Commission (PSC) holding, in pertinent part, that no retroactive ratemaking occurred when the PSC allowed Detroit Edison to defer 1997 extraordinary storm-related expenses and to amortize them during 1998 and 1999. We affirm.

I

On March 14, 1997, an ice storm resulted in power outages to more than 300,000 Detroit Edison customers. On April 6, 1997, a windstorm resulted in power outages to more than 100,000 Detroit Edison customers. On July 2, 1997, a windstorm and tornado left more than 300,000 Detroit Edison customers without power.

To address these situations, Detroit Edison authorized overtime, used foreign line crews, and procured materials and equipment on an emergency basis. As a result, Detroit Edison had adjusted storm damage expenses for 1997 of $44,260,513.

Detroit Edison's rates for 1997 had been set in a January 21, 1994, opinion and order in Case No. U-10102, and were based on a forecasted 1994 test year. The 1994 test year amount for storm-related expenses was $14,415,000. Detroit Edison claimed that its 1997 base rates therefore provided for $14,415,000 in annual storm-related expenses. After deducting $14,415,000 from its adjusted 1997 storm damage expenses of $44,261,000 (rounded up), Detroit Edison claimed that it had $29,846,000 in 1997 extraordinary storm-related expenses.

MCL 460.556 provides the PSC with the power to prescribe uniform methods of keeping accounts for electric utilities. Consistently with this authority, the PSC adopted the Uniform System of Accounts, see 1979 AC, R 460.9001, as amended by 1986 MR 12, R 460.9001, including Account 182.1:

> 182.1 Extraordinary Property Losses.
>
> A. When authorized or directed by the Commission, this account shall include extraordinary losses, which could not reasonably have been anticipated and which are not covered by insurance or other provisions, such as unforeseen damages to property.
>
> B. Application to the Commission for permission to use this account shall be accompanied by a statement giving a complete explanation with respect to the items which it is proposed to include herein, the period over which, and the accounts to which it is proposed to write off the charges, and other pertinent information.

On November 19, 1997, Detroit Edison filed an application with the PSC seeking to amortize the $29,846,000 in 1997 extraordinary storm-related expenses over two years, beginning in 1998. It sought to offset the 1998 amount of $14,923,000 against a previously ordered rate reduction of $53,357,000.[1] Detroit Edison proposed that the net amount of $38,434,000 be refunded to retail electric tariff customers in 1998, and further proposed that the remaining storm expense be deferred and amortized consistent with PSC Account 182.1.

In response to this application, the PSC issued an ex parte order on November 25, 1997, allowing Detroit Edison to amortize the 1997 extraordinary storm-related expenses during 1998 and 1999, and to offset half of these expenses in 1998 against the previously ordered rate reduction of $53,357,000. Because this did not result in an increase in customer rates, the PSC determined that ex parte relief was appropriate and that no contested case hearing was required under MCL 460.6a(1). While an appeal of this order was pending in this Court, the PSC authorized a similar offset of the other half of the storm-related expenses against 1999 rate reductions. This Court then reversed, holding that even though the net effect was a rate reduction, such an offset against a previously ordered rate reduction was in effect a rate increase. This Court also remanded for notice and a hearing on the rate increase as required by § 460.6a(1). See the unpublished opinion per curiam of the Court of Appeals, issued June 11, 1999 (Docket No. 207993).

---

[1] Pursuant to a 1988 settlement agreement, for the years 1988 through 1997 Edison was allowed to recover increased costs associated with owning and operating the Fermi 2 nuclear power plant. However, the settlement agreement provided that in 1998, Edison was to reduce this revenue for the Fermi 2 phase-in by $53,357,000.

On remand, the Attorney General objected to the accounting and ratemaking treatment of the storm-related expenses, arguing that Detroit Edison was in effect implementing a rate increase in 1998 on the basis of costs incurred in 1997, constituting impermissible retroactive ratemaking. Noting that the PSC had adopted the Uniform System of Accounts, Detroit Edison argued that it was appropriate under Account No. 182.1 to use deferred cost accounting for the extraordinary costs associated with the unusually severe storm damage. Detroit Edison further argued that once costs were deferred, it was proper to recover the costs during the year to which they were deferred. The PSC held:

> The legal principle that prohibits retroactive ratemaking does not support the Attorney General's position. As noted by Detroit Edison, the November 25, 1997 order authorizing a rate credit did not take effect until the beginning of 1998. Thus, it was prospective. . . .
>
> As stated in Account No 182.1 of the Uniform System of Accounts, "Extraordinary property losses," using deferred cost accounting to record storm damages is permissible with prior Commission authorization as an instance of "unforeseen damages to property." . . . Although authorization to use deferred cost accounting does not itself alter rates, it may create ratemaking issues if the company seeks to recover the amortization through a rate request. However, it is well established that the rate recovery of amortization is permissible and is not retroactive ratemaking. [*Ass'n of Businesses Advocating Tariff Equity (ABATE) v Public Service Comm*, 208 Mich App 248, 260-261; 527 NW2d 533 (1994)]; *Detroit Edison Co v [Public Service Comm]*, 221 Mich App 370, 374-76; 562 NW2d 224 (1997). See [*ABATE*], 208 Mich App 261 ("Conceptually, ratepayers are charged for the amortization expense when it occurs and, therefore, rates coincide with the expense and are not retroactive.")

On appeal, the Attorney General argues that the PSC erred in concluding that the deferral and amortization of the storm-related expenses did not constitute retroactive ratemaking.

II

Our review of PSC orders is limited.

"Pursuant to MCL 462.25 . . . all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Michigan Consolidated Gas Co v Public Service Comm*, 389 Mich 624; 209 NW2d 210 (1973). An aggrieved party bears the burden of proving by clear and convincing evidence that the order appealed is unlawful or unreasonable. MCL 462.26(8). . . . An order is unlawful if it is based on an erroneous interpretation or application of the law, and it is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Public Service Comm*, 377 Mich 259; 140 NW2d 515 (1966). A reviewing court must give due deference to the administrative expertise of the PSC and may not substitute its judgment for that of the agency. *City of Marshall v Consumers Power Co (On Remand)*, 206 Mich App 666, 677; 523 NW2d 483 (1994). However, this does not mean that courts may abandon or delegate their responsibility to interpret statutory language and legislative intent. *Miller Bros v Public Service Comm*, 180 Mich App 227, 232; 446 NW2d 640 (1989)."

Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. *Consumers Power Co v Public Service Comm*, 460 Mich 148, 157; 596 NW2d 126 (1999). Indeed, the PSC possesses only the authority granted to it by the Legislature. The statutes that confer power on the PSC are strictly construed, and this Court does not weigh the economic and public policy factors that underlie the actions taken by the PSC. *Id.* at 156. [*In re Complaint of Pelland*, 254 Mich App 675, 681-682; 658 NW2d 849 (2003).]

III

We conclude that the PSC order at issue is neither unlawful nor unreasonable. The PSC did not exceed the scope of its authority by permitting the use of deferred cost accounting for storm-related expenses, and, because previous rates were not charged to correct further deficiencies caused by the storms, retroactive ratemaking did not occur.

The Attorney General's reliance on *Michigan Bell Tel Co v Public Service Comm,* 315 Mich 533; 24 NW2d 200 (1946), is misplaced. The precise issue in this case, whether costs that are incurred at a higher amount than estimated may be deferred to a future date and what effect such a deferral would have on subsequent rates, has not been previously addressed. In *Michigan Bell,* the PSC determined that Michigan Bell had made excessive depreciation charges and had avoidable expenses such that it should reduce its gross revenues for 1944 by $3,500,000. The PSC ordered Michigan Bell to devise a plan to distribute this amount to its customers for the year 1944. Noting that the rates charged in 1944 were lawfully imposed because the PSC's predecessor had authorized them, the Supreme Court held that "a lawfully established rate remains in force until altered by a subsequently established lawful rate." *Id.* at 544. The Court also held that "[t]here is no express or reasonably implied statutory provision authorizing the commission to alter or readjust telephone rates or charges retroactively. *Id.* at 545. The Court noted that rates are set in the commission's legislative capacity, and therefore must be construed like statutes and only be given prospective effect. The Court concluded: "[T]he commission exceeded its statutory powers in attempting to enforce its . . . order retroactively. The

commission's power to fix utility rates and charges is limited to orders which are prospectively effective." *Id.* at 554-555.

In *Detroit Edison Co v Public Service Comm*, 416 Mich 510, 523; 331 NW2d 159 (1982), the Supreme Court reiterated that "the essential principle of the rule against retroactive ratemaking is that when the estimates [of costs on which rates are based] prove inaccurate and costs are higher or lower than predicted, the previously set rates cannot be changed to correct for the error; the only step that the MPSC can take is to prospectively revise rates in an effort to set more appropriate ones." In that case, the Court determined that a fuel adjustment charge, which was altered monthly on the basis of the two prior months' fuel costs, was proper because it was not designed to recoup prior costs, but, instead, used prior costs as an estimate of current costs.

In *ABATE, supra* at 261, the PSC approved Consumers Power Company's request to first capitalize costs associated with the development and construction of a nuclear power facility that never became operative and to then amortize the costs. This Court concluded that this practice was consistent with accepted regulatory and accounting principles, and that "when capitalized expenditures are amortized, the amortization becomes a current expense even though it reflects expenditures that were capitalized in the past." *Id.*

In *Detroit Edison Co v Public Service Comm*, 221 Mich App 370; 562 NW2d 224 (1997), Detroit Edison incurred a $3,028,000 expense in 1993 as the result of a change in generally accepted rules of accounting for the cost of postretirement benefits. Specifically, Statement of Financial Accounting Standards (SFAS) 106 required companies to account for these costs on an accrual basis

during the working lives of their employees. Edison deferred these SFAS 106 accrued costs until 1994 pursuant to a December 8, 1992, PSC decision in Case No. U-10040, in which the PSC held that utilities would be permitted to defer these costs for up to three years. Edison then sought to recover $3,028,000 of the deferred 1993 expenses in 1994. The Court stated:

> For ratemaking purposes the expenses under SFAS 106 did not have to be recognized in 1993. Given the circumstances, which included a change in accounting rules that had to be implemented over time, permitting Detroit Edison to begin amortizing the expenses in 1994 was not unlawful or unreasonable. . . .
>
>           \*   \*   \*
>
> The PSC's treatment of the SFAS 106 costs did not constitute retroactive ratemaking. Retroactive ratemaking, which is prohibited, involves a change either upward or downward in the rates charged by a utility for its services under a lawful order. . . . Ratemaking orders are prospective in effect. . . . The PSC's decision in this case concerning SFAS 106 expenses did not alter the rates charged in 1993. The 1994 rates were based on 1994 expenses, one of which was the deferred 1993 SFAS 106 expense permitted by [PSC Case No.] U-10040. [221 Mich App 375-376.]

The PSC's deferral and ratemaking treatment of Detroit Edison's 1997 extraordinary storm-related expenses in this case is consistent with precedent from the Supreme Court and this Court. First, the only rates at issue in this case were the rates to be charged by Detroit Edison in 1998 and 1999. Unlike the circumstances presented in *Michigan Bell,* the PSC did not authorize or require Detroit Edison to adjust the rates charged in a prior year. Rather, the PSC entered separate orders permitting deferral and ratemaking treatment for 1998 and the ratemaking treatment for 1999. Each of these

orders affected future rates, and therefore constituted orders providing for prospective ratemaking consistent with the principles set forth in *Michigan Bell*.

Additionally, and similarly to *Detroit Edison,* 221 Mich App 370, in this case there was no adjustment to previously set rates, but only future rates were affected. Thus, the PSC's orders do not violate the principle that previously set rates cannot be adjusted to account for costs that are higher than estimated. Moreover, the 1998 and 1999 rates were not being adjusted to account for 1997 expenses. Once these expenses were deferred, they became expenses incurred in the year to which they were deferred. Thus, the 1998 and 1999 rates were being charged prospectively for expenses incurred in 1998 and 1999. Although this reasoning requires recognition of an accounting convention, it is consistent with established and accepted regulatory and accounting principles. Indeed, the account for extraordinary property losses dates back to the PSC's adoption of a new uniform system of accounts in 1954, to be effective on January 1, 1961, in recognition of "changes in the art of accounting." See 1954 AACS, R 460.3182.

In this regard we reject the Attorney General's argument that *Detroit Edison,* 221 Mich App 370, is distinguishable on the basis that the deferral of expenses in that case was approved before they were incurred whereas in the present case the PSC approval occurred after the storm-related expenses were incurred. The Court in *Detroit Edison, id.,* did not establish as a principle of law that the timing of the request had any bearing on whether approval of the expense deferral was appropriate. The Attorney General fails to show that the manner in which the expense deferral was treated was inconsistent with accepted regulatory and accounting principles.

The deferral and ratemaking treatment in this case was also consistent with *ABATE,* which concluded that the recovery of deferred expenses did not constitute retroactive ratemaking. We reject the Attorney General's contention that *ABATE* is distinguishable because it involved amortization of a capital expenditure rather than amortization of deferred expenses. Each amortization process is consistent with accepted regulatory and accounting principles.

Finally, PSC Case Nos. U-8635, U-8812, and U-8854, cited by the Attorney General in support of the proposition that the deferral of costs may only be approved before the costs are incurred, do not buttress the Attorney General's position. In these cases Michigan Consolidated Gas Company spent $11,400,000 on environmental removal and remediation in 1984 and expensed the costs in 1984. In a subsequent year, Michigan Consolidated Gas Company sought to reverse the 1984 treatment of these costs and to have them deferred and amortized. The PSC disallowed the requested treatment, not because the utility failed to make the request before the expense was incurred, but, instead, because the expense treatment was not timely sought. The requested treatment was untimely because the deferral request was not made until after the utility had already chosen a method of expensing the cost. In this case, Detroit Edison requested deferral and amortization of the 1997 extraordinary storm-related expenses before it closed its books at the end of the 1997 calendar year. Thus, its request was timely.

Affirmed.