# STATE OF MICHIGAN

# COURT OF APPEALS

In re Application of DTE ELECTRIC COMPANY to Increase Rates.

DTE ELECTRIC COMPANY,

        Petitioner-Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION, MICHIGAN CABLE TELECOMMUNICATIONS ASSOCIATION, MICHIGAN ENVIRONMENTAL COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, and ATTORNEY GENERAL,

        Appellees.

UNPUBLISHED
February 13, 2018

No. 331599
MPSC
LC No. 00-017767

In re Application of DTE ELECTRIC COMPANY to Increase Rates.

ASSOCIATION OF BUSINESSES ADVOCATING TARIFF EQUITY,

        Appellant,

v

DTE ELECTRIC COMPANY,

        Petitioner-Appellee,

and

MICHIGAN PUBLIC SERVICE COMMISSION, NATURAL RESOURCES DEFENSE COUNCIL, and MICHIGAN CABLE

No. 331868
MPSC
LC No. 00-017767

-1-

TELECOMMUNICATIONS ASSOCIATION,

      Appellees.

_____

In re Application of DTE ELECTRIC COMPANY
to Increase Rates.

_____

RESIDENTIAL CUSTOMER GROUP,
DOMINIC CUSUMANO, and LILLIAN
CUSUMANO,

      Appellants,

v                                   No.  332159
                                       MPSC
DTE ELECTRIC COMPANY,                   LC No.  00-017767

      Petitioner-Appellee,

and

MICHIGAN PUBLIC SERVICE COMMISSION
and MICHIGAN CABLE
TELECOMMUNICATIONS ASSOCIATION,

      Appellees.

_____

Before:  BOONSTRA, P.J., and METER and GADOLA, JJ.

PER CURIAM.

In these consolidated appeals, appellants DTE Electric Company, the Association of Businesses Advocating Tariff Equity (ABATE), the Residential Customer Group (RCG), and Dominic and Lillian Cusumano appeal various aspects of an order entered on December 11, 2015, by the Michigan Public Service Commission (PSC) in a general rate case[1] filed by DTE. We affirm in each case.

---

[1] A "general rate case" is "a proceeding initiated by a utility in an application filed with the commission that alleges a revenue deficiency and requests an increase in the schedule of rates or charges based on the utility's total cost of providing service." MCL 460.6a(16)(b).

# I. BACKGROUND

On December 19, 2014, DTE filed an application seeking a rate increase. The application stated, in pertinent part:

> 4. The Company has determined the need for additional annual revenues in the amount of approximately $370 million effective as soon as possible in 2015, in order to recover, inter alia, the Applicant's costs associated with environmental compliance, the capital costs associated with the addition of plant, including additional generation, safety and reliability of its electric distribution system and generation plants and capacity upgrades; capital structure costs changes; the operation and maintenance of Applicant's electric distribution system and generation plants; and the costs associated with inflation.

The application was based on a test year of July 1, 2015, through June 30, 2016. Among other things, DTE sought: (1) to capitalize $45 million in annual expenses associated with its Enhanced Vegetation Management Program (EVMP), a program designed to expand clearing in its rights of way; (2) to continue its Advanced Metering Infrastructure (AMI)[2] initiative; and (3) to achieve a return on equity (ROE) of 10.75%.

On December 11, 2015, the PSC issued an order authorizing DTE to increase its rates by $238,177,188.

Regarding DTE's EVMP, the PSC concluded that reliability could be improved if DTE could accomplish the goals of the EVMP, and it therefore approved $11.25 million as an operation-and-maintenance expense to fund a pilot program. The PSC disallowed the capitalization requested by DTE.

Regarding DTE's request for an ROE of 10.75%, the PSC concluded:

> The Commission finds that an ROE of 10.3% will best achieve the goals of providing appropriate compensation for risk, ensuring the financial soundness of the business, and maintaining a strong ability to attract capital. With respect to the modeling results, the Commission has considered the many criticisms leveled on both sides, but does not find it necessary to reject any of the proffered data.

> DTE Electric has an ambitious capital investment program, much of which is related to environmental and generation expenditures that are unavoidable and are saddled with time requirements. The Commission observes that 10.3% is only slightly above the upper point of the Staff's recommended ROE range. Nationally, and in Michigan, ROEs have shown a steady decline, and the

---

[2] An AMI meter measures and records real-time data on power consumption and reports that consumption to the utility on a regular basis; an AMI meter is also known as a "smart meter." See *In re Applications of Detroit Edison Co*, 296 Mich App 101, 114; 817 NW2d 630 (2012).

Attorney General is correct that Michigan's economy has stabilized; thus, the Commission finds that it is appropriate to reduce DTE Electric's ROE slightly. Unlike the 2010 order cited to by the company, economic conditions in DTE Electric's service territory have improved markedly, and access to credit is no longer an issue. For these reasons, and those cited by the ALJ, the Commission finds that the risk associated with DTE Electric has also decreased, and that an ROE of 10.3% appropriately reflects these changes.

Regarding DTE's AMI opt-out program, the PSC noted that RCG contended that the program should be altered or eliminated; however, the PSC relied on its previous decisions and appellate opinions to conclude that RCG raised no new arguments and that its challenge to the AMI opt-out program should be rejected once again.

Finally, the PSC approved DTE's request to amortize $12.7 million associated with a January 1, 2012, tax increase by the city of Detroit, finding that the accounting treatment was consistent with that set forth in previous PSC orders.

DTE filed an appeal challenging the PSC's decision to disallow capitalization of expenses associated with the EVMP. ABATE filed an appeal challenging the PSC's establishment of an ROE of 10.3%. RCG and the Cusumanos filed an appeal challenging the PSC's decision to preserve the AMI opt-out program. The appeals were consolidated for hearing and decision.

## II. STANDARD OF REVIEW

The standard of review for PSC orders is narrow and well-defined. *In re Application of Consumers Energy Co to Increase Rates (On Remand*, 316 Mich App 231, 236; 891 NW2d 871 (2016). All rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. MCL 462.25. A party aggrieved by an order of the PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, an appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. *In re MCI Telecommunications Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). An order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Pub Serv Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Pub Serv Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987).

We give due deference to the PSC's administrative expertise, and we are not to substitute our judgment for that of the PSC. We give respectful consideration to the PSC's construction of a statute that the PSC is empowered to execute, and we will not overrule that construction absent cogent reasons. If the language of a statute is vague or obscure, the PSC's construction serves as an aid to determining the legislative intent, and will be given weight if it does not

conflict with the language of the statute or the purpose of the Legislature. However, the construction given to a statute by the PSC is not binding on this Court. Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. [*In re Application of Consumers Energy Co to Increase Rates*, ___ Mich App ___; ___ NW2d ___ (2017) (Docket Nos 330675, 330745, and 330797); slip op at 5 (citations omitted).]

## III. ANALYSIS

### DOCKET NO. 331599

Appellant DTE argues that the PSC erred as a matter of law by disallowing the capitalization of EVMP costs. DTE contends that the evidence showed that the activities associated with the EVMP constituted a "first clearing" and that DTE would be acting in accordance with applicable accounting-system requirements by capitalizing EVMP costs.

The construction and maintenance of electric utility lines involves the "first clearing" of vegetation in an area and the subsequent maintenance of the vegetation to ensure the continuing safe and reliable operation of the lines. After the widespread ice storm at the end of 2013, DTE sought to become more proactive in clearing vegetation around power lines. As noted, when DTE filed the instant rate case, it requested authority to capitalize $45 million in EVMP costs. DTE witness Russell Pogats characterized the expanded trimming as a first clearing because it constituted a different procedure than that undertaken during routine maintenance. The essence of DTE's argument is that because the costs associated with a first clearing are properly capitalized under the Uniform System of Accounts for electric utilities, and because DTE characterized the expanded trimming as a first clearing, the PSC was required to approve the capitalization.

The PSC stated that it was "not presently convinced that [the EVMP] is fundamentally different from enhanced clearing, the costs of which have never been capitalized." This statement by the PSC was based on competent, material, and substantial evidence. Indeed, the engineering testimony by PSC Staff witness Peter Derkos indicated that the EVMP was simply an expanded vegetation-maintenance program because the initial clearing and grading of the areas at issue had been done previously. The PSC is entitled to rely on evidence from an expert witness, even if other expert witnesses present contradictory testimony. *In re Application of Consumers Energy to Increase Electric Rates (On Remand)*, 316 Mich App 231, 240; 891 NW2d 871 (2016), citing *Great Lakes Steel Div of Nat'l Steel Corp v Mich Pub Serv Comm*, 130 Mich App 470, 481; 344 NW2d 321 (1983). We find no basis for reversal.[3]

---

[3] In contrast to DTE's insinuation, at no point did the PSC find that expenses associated with a first clearing of vegetation should not be capitalized in accordance with the Uniform System of Accounts. The PSC found that absent a cost-benefit analysis and a pilot program to demonstrate sustained reliability, the expanded removal of vegetation under the EVMP should not be capitalized in this rate case, but that, instead, $11.25 million should be authorized as an

Appellant ABATE argues that the PSC erred by approving an ROE of 10.3%. ABATE states that no witness supported the approval of an ROE of 10.3%. ABATE contends that the PSC provided no rationale for choosing the rate it did and that the rate chosen by the PSC must be deemed arbitrary and capricious. We disagree.

> The establishment of a reasonable utility rate is not subject to precise computation. What is reasonable depends upon a comprehensive examination of all factors involved, having in mind the objective sought to be attained in its use. As long as the PSC chooses a rate that is neither so low as to be confiscatory nor so high as to be oppressive, the PSC has discretion to set the rate at the level it chooses. [*In re Application of Consumers Energy Co to Increase Rates*, ___ Mich App ___; slip op at 5 (quotation marks and citation omitted.]

Testimony from witnesses supported the PSC's approval of an ROE of 10.3%. DTE witness Michael Vilbert recommended an ROE range of 9.5% to 10.8%, but requested an ROE of 10.75% due to Michigan's challenging economic environment and DTE's level of risk. Vilbert used a proxy sample of 28 regulated utility companies and applied three economic models to reach his conclusions. Staff witness Harshleen Sandhu used a proxy group of 10 companies and applied various economic models to calculate ROEs ranging from 7.51% to 10.25%. The Attorney General's witness recommended an ROE of 9.75%, and observed that average ROEs approved by other state regulatory commissions had declined from in excess of 12.7% in 1990 to 9.66% in 2015. ABATE's witness recommended an ROE of 9.5%, and also observed that average ROEs had declined for the past several years. The PSC was entitled to rely on the evidence from these experts, even if other witnesses presented contradictory testimony. *In re Application of Consumers Energy to Increase Electric Rates*, 316 Mich App at 240.

The rate of 10.3% was only slightly above the Staff's recommended range. The PSC acknowledged that ROEs were trending downward nationally and that Michigan's economy had stabilized, and thus reasoned that DTE's ROE could be reduced slightly without impeding DTE's access to credit. The PSC must "consider and give due weight to all lawful elements necessary" to determine an appropriate rate. MCL 460.557(2). The PSC "is not bound by any single formula or method" in determining rates and "may make pragmatic adjustments when warranted by the circumstances." *Detroit Ed Co v Pub Serv Comm*, 221 Mich App 370, 375; 562 NW2d 224 (1997). After examining the evidence, the PSC determined that an ROE of 10.3% was appropriate. In doing so, the PSC acted consistently with its statutory authority, MCL 460.557(2), and acted within its discretion, *Detroit Ed Co*, 221 Mich App at 375.

DOCKET NO. 332159

---

operating-and-maintenance expense for a pilot program. The wording of the PSC's order ("not presently convinced") makes clear that it was not foreclosing the possibility that it could authorize the capitalization of EVMP costs in a future general rate case.

Appellants RCG and the Cusumanos argue that the PSC lacked the authority, absent specific statutory guidance, to mandate the installation of smart meters in customers' homes by approving DTE's AMI program and its attendant tariffs on an "opt-out" basis. This Court has already fully addressed this issue and the accompanying sub-arguments (dealing with alleged constitutional violations and alleged "surcharges" on people opting out of the AMI program) in *In re Application of Consumers Energy Co to Increase Rates*, ___ Mich App ___; slip op at 6-10. *In re Application of Consumers Energy Co to Increase Rates* is binding authority, MCR 7.215(J)(1), and mandates a rejection of appellants' arguments in the present case.

Regarding the challenge by appellants to the "appropriateness" of the AMI opt-out fees, the PSC noted that appellants did not present new evidence regarding the fees, and concluded that because the current opt-out charges were appropriate and supported by evidence in the record in Case No. U-17053, it need not reexamine the issue in the instant case.

On July 31, 2012, DTE filed an application requesting approval of its AMI opt-out program for residential customers. The PSC docketed the case as Case No. U-17053. Witness Robert Sitkauskas, the Manager of DTE's AMI Technology Group, presented testimony and exhibits detailing initial fees to be charged to opt-out customers to cover work done by meter technicians to install and modify meters for customers who did not wish to participate in the program, and monthly fees to cover special meter reads and other ongoing services. Sitkauskas testified that DTE proposed an initial fee of $87 and monthly fees of $15.

On May 15, 2013, the PSC issued an order approving DTE's opt-out program in Case No. U-17053.[4]

In the instant case, the PSC made the following statement regarding its reliance on the evidence presented in Case No. U-17053:

> The Commission agrees with the RCG that no new formal cost of service study (COSS) or other cost support was introduced in this rate case to justify the current opt-out program charges. This fact is not disputed. However, the Commission also agrees with DTE Electric and the Staff that ample cost support was presented regarding the approved charges in Case No. U-17053. According to *Pennwalt Corp v Pub Serv Comm*, [166 Mich App 1, 9; 420 NW2d 156 (1988)], the Commission may rely on that evidence and the Commission's previous determinations regarding those surcharges in this case in the absence of new evidence or evidence of a change of circumstances that would necessitate a reconsideration. It is worth noting that Case No. U-17053 was a contested case proceeding that met the requirements of the Michigan Administrative Procedures Act of 1969, MCL 24.201, *et seq*. (APA), and satisfied due process concerns such as notice and an opportunity to be heard. Many utility customers intervened in

---

[4] In *In re Application of Detroit Ed Co to Implement Opt Out Program*, unpublished opinion per curiam of the Court of Appeals, issued February 19, 2015 (Docket Nos. 316728 and 316781), this Court affirmed the PSC's order.

Case No. U-17053 and the RCG could also have intervened. Further, the fact that the Court of Appeals affirmed the Commission's approval of DTE Electric's opt-out program and charges further assures the Commission that its decision in Case No. U-17053 is supported by competent, material, and substantial evidence on the whole record. Here, in the absence of new evidence or evidence of a change of circumstances, the Commission concludes that the current opt-out charges are appropriate and supported by the record evidence supplied in Case No. U-17053. The Commission also agrees with the PFD and adopts the Staff's proposal recommending a review of the utility's opt-out charges in either its next rate case or six months after the completion of AMI meter installations, whichever occurs first.

The issue of the appropriateness of DTE's opt-out fees was fully litigated and decided in the contested case proceeding in Case No. U-17053. The PSC correctly found that the issue need not be "completely relitigated" in this case because appellants established no basis for doing so. *Pennwalt Corp*, 166 Mich App at 9.

Finally, appellants RCG and the Cusumanos argue that the PSC unlawfully and unreasonably included in DTE's rates a city of Detroit tax expense that became effective on January 1, 2012, and thus predates the relevant test year in this case. They contend that inclusion of this tax in DTE's rates constituted unlawful retroactive ratemaking and undermines the concept of the test year. We disagree.

Retroactive ratemaking is prohibited; the PSC acts in a legislative capacity when it establishes a rate and cannot subsequently change that rate absent statutory authority. *Mich Bell Tel Co v Pub Serv Comm*, 315 Mich 533, 544-547; 24 NW2d 200 (1946); *Mich Consol Gas Co v Pub Serv Comm*, 264 Mich App 424, 429; 691 NW2d 29 (2004).

The city of Detroit increased its corporate tax rate from 1% to 2%, effective January 1, 2012. DTE's tax witness testified that the PSC had allowed amortization of deferred tax balances in previous cases, and that DTE was requesting similar treatment in this case. The PSC found that the requested treatment did not constitute retroactive ratemaking, and noted that DTE's request was consistent with accounting treatment authorized in prior PSC cases.

We conclude that the PSC's decision to allow DTE to amortize payments associated with the tax did not constitute retroactive ratemaking. By definition, retroactive ratemaking occurs when the PSC, absent specific legislative authority, changes a rate established in a previous order. *Mich Bell Tel Co*, 315 Mich at 544-547.

In *Attorney General v Pub Serv Comm*, 262 Mich App 649, 650; 686 NW2d 804 (2004), this Court affirmed the PSC's decision allowing DTE to defer unexpected expenses incurred in 1997 and to amortize those expenses in 1998 and 1999. This Court concluded that the amortization did not constitute retroactive ratemaking because the PSC's decision did not allow DTE to change rates charged in a prior year. *Id*. at 657. Similarly, in the instant case, the PSC allowed DTE to use deferred cost-accounting as part of the procedure for establishing a prospective rate in this general rate case. The PSC did not change a rate established in a previous case and thus did not implement retroactive ratemaking.

Affirmed.

/s/ Mark T. Boonstra
/s/ Patrick M. Meter
/s/ Michael F. Gadola