# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* Application of DTE ELECTRIC COMPANY
to Increase Rates.

---

RESIDENTIAL CUSTOMER GROUP,

       Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION
and MICHIGAN CABLE
TELECOMMUNICATIONS ASSOCIATION,

       Appellees,
and

DTE ELECTRIC COMPANY,

       Petitioner-Appellee.

UNPUBLISHED
October 25, 2018

No. 338378
MPSC
LC No. 00-018014

---

Before: CAVANAGH, P.J., and MARKEY and LETICA, JJ.

PER CURIAM.

Residential Customer Group (hereinafter "Residential") appeals as of right the January 31, 2017 order of the Michigan Public Service Commission (MPSC) in Case No. U-18014, which allowed DTE Electric Company (DTE) to increase its rates, and annual revenues to increase by approximately $184 million. Specifically, this appeal involves the same challenges Residential has raised in several prior cases involving DTE and Consumers Energy Company in regards to the implementation of an Advanced Meter Infrastructure (AMI) and smart meter program. We affirm.

## I. STANDARD OF REVIEW

As this Court explained in *In re Application of Consumers Energy Co to Increase Rates*, 322 Mich App 480, 486-487; 913 NW2d 406 (2017) (citation and internal caselaw omitted):

The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. A party aggrieved by an order of the [M]PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. An order is unreasonable if it is not supported by the evidence.

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28.

We give due deference to the PSC's administrative expertise and will not substitute our judgment for that of the PSC. We give respectful consideration to the [M]PSC's construction of a statute that the PSC is empowered to execute, and this Court will not overrule that construction absent cogent reasons. If the language of a statute is vague or obscure, the PSC's construction serves as an aid in determining the legislative intent and will be given weight if it does not conflict with the language of the statute or the purpose of the Legislature. However, the construction given to a statute by the PSC is not binding on us. Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo.

"Constitutional claims are . . . reviewed de novo." *Ligon v City of Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2007).

We also note the following passage of *In re Consumers Energy Co App*, 322 Mich App at 493-494 because it is pertinent to all of Residential's arguments in this appeal:

Ratemaking is a legislative, rather than a judicial, function. For that reason, the doctrines of res judicata and collateral estoppel do not apply in a strict sense. Nevertheless, factual "issues fully decided in earlier [M]PSC proceedings need not be 'completely relitigated' in later proceedings unless the party wishing to do so establishes by new evidence or a showing of changed circumstances that the earlier result is unreasonable." *In re Application of Consumers Energy Co for Rate Increase*, 291 Mich App 106, 122; 804 NW2d 574 (2010), quoting *Pennwalt Corp v Pub Serv Comm*, 166 Mich App 1, 9; 420 NW2d 156 (1988).

## II. SMART METERS AND MPSC JURISDICTION

Residential contends that the MPSC lacks statutory authority to issue orders or approve tariffs that require the installation of smart meters. Specifically, Residential challenges the authority of the MPSC to permit DTE to require customers electing to opt out of the smart meter program to pay surcharges. Residential argues that the MPSC should have required DTE to consider and implement an opt-in program where customers are given notice and an opportunity to reject smart meter installation and to avoid costs for the decision to decline the new

technology. According to Residential, the MPSC improperly relied on rulings from prior proceedings that are non-binding because they did not comprise contested or formal ratemaking cases. Having relied on a faulty procedure, Residential asserts that the MPSC erred in foreclosing the presentation of evidence and argument for the alternative opt-in approach that Residential advocates.

Residential's arguments have previously been rejected by this Court in a published opinion, and we must follow precedent set by another panel of this Court in cases issued after November 1, 1991. MCR 7.215(J)(1); *Johnson v Heite*, 243 Mich App 578, 593; 624 NW2d 738 (2000). Notably, in *In re Consumers Energy Co App*, 322 Mich App at 489, this Court addressed Residential's contention that

> the [M]PSC lacked the authority, absent specific statutory guidance, to mandate the installation of smart meters in customers' homes by approving Consumers' smart meter program and its attendant tariffs on an "opt-out" basis. [Residential] . . . specifically argue[s] that in prior uncontested cases, the [M]PSC foreclosed the presentation of evidence concerning health questions and privacy matters related to smart meters and that this defective process prevented the introduction of evidence regarding an alternative "opt-in" approach that would have respected customer choices and concerns.

As noted, this Court has previously rejected identical arguments by Residential. *Id*. at 490-491. We explained that while it is true that no statute specifically allows a utility to require customers to participate in a smart meter program or to pay surcharges if the customer opts out of the program, *id*. at 490, this is because the decision to switch to smart meters "can only be described as a management prerogative." *Id*. Residential's "suggestion that the [M]PSC could order [a public utility] to develop an opt-in program is clearly the type of action found invalid in *Union Carbide* [*v Pub Serv Comm*], 431 Mich [135,] 148-150[; 428 NW2d 322 (1988]." *In re Consumers Energy Co App*, 322 Mich App at 490. Thus, the suggestion that the MPSC could direct DTE to use an opt-in program lacks merit. *Id*. Further, because "approval of the opt-out fees was a proper exercise of the [M]PSC's ratemaking authority[]" with respect to another public utility (i.e., Consumers Energy), *id*. at 491, the MPSC's approval of DTE's opt-out fees similarly constitutes a proper exercise of its authority. We are bound to follow this Court's earlier ruling in *In re Consumers Energy Co App*, 322 Mich App at 480, as a published decision of this Court decided after November 1, 1990. MCR 7.215(J)(1). In the absence of any basis to deviate from this Court's prior decisions, Residential's arguments are again rejected.[1]

---

[1] While unpublished decisions are not binding, MCR 7.215(C)(1), it is worth noting that Residential's arguments have been raised on multiple occasions and uniformly rejected. In a recent unpublished opinion, this Court rejected the identical arguments made by Residential in this appeal in regards to DTE's smart meter program:

> Appellant[] R[esidential] . . . argue[s] that the [M]PSC lacked the authority, absent specific statutory guidance, to mandate the installation of smart meters in customers' homes by approving DTE's AMI program and its attendant

## III. CONSTITUTIONAL CLAIMS

Residential asserts that requiring customers to use smart meters without their consent raises privacy concerns and is violative of due process. Residential argues that its constitutional claims cannot be avoided despite DTE's lacking the status of a state actor because the MPSC's approval fulfills the requirement of state action. According to Residential, the overly-intrusive nature of smart meters facilitates unreasonable searches and seizures and the possible mishandling of the private consumers' data. Residential contends, however, that the adoption of an "opt-in" tariff would alleviate these concerns.

In *In re Consumers Energy Co App*, 322 Mich App at 491-493, this Court addressed and rejected Residential's argument that "the PSC's disregard of Consumers' customers' concerns about privacy, data collection, and the transmittal of data violates due-process and Fourth Amendment principles." This Court held "that the installation of a smart meter on a customer's home does not violate the customer's rights under the Fourth Amendment of the United States Constitution because Consumers is not a state actor." *Id*. at 491. Because DTE, as did Consumers, lacks the status of a state actor, we again reject Residential's arguments on this issue. *Id*. at 492-493; MCR 7.215(C)(2) and (J)(1).[2]

For the first time on appeal, Residential asserts a claim that the installation of smart meters is a criminal act in violation of MCL 750.539d, which pertains to the installation of a recording or transmitting device in a private location without consent. Arguments raised for the first time in an appellate reply brief are insufficient to present an issue for appeal. *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003). Further, while

---

tariffs on an "opt-out" basis. This Court has already fully addressed this issue and the accompanying sub-arguments (dealing with alleged constitutional violations and alleged "surcharges" on people opting out of the AMI program) in *In re Application of Consumers Energy Co to Increase Rates*, [322 Mich App 480] . . . . *In re Application of Consumers Energy Co to Increase Rates* is binding authority, MCR 7.215(J)(1), and mandates rejection of appellants' arguments in the present case. [*In re Application of DTE Electric Co to Increase Rates*, unpublished per curiam opinion of the Court of Appeals, issued February 13, 2018 (Docket Nos. 331599, 331868, 332159), p 7.]

The same arguments by Residential were also rejected by this Court in *In re Application of Detroit Edison Co to Implement Opt Out Program*, unpublished per curiam opinion of the Court of Appeals, issued February 19, 2015 (Docket Nos. 316728, 31678), pp 5-8.

[2] While unpublished decisions are not binding, MCR 7.215(C)(1), we note that this Court has rejected essentially identical constitutional claims premised on the same reasoning (i.e., that DTE is not a governmental actor), in *In re Application of Detroit Edison Co to Implement Opt Out Program*, unpub op at 8-9 (Docket Nos. 316728, 316781). See also *In re Application of Consumers Energy Co to Increase Rates*, unpublished opinion of the Court of Appeals, issued October___, 2018 (Docket No. 338592, rejecting Residential's due process claims.

Residential claims that smart meters are overly intrusive and capable of discovering exactly when and how much energy is used by each particular device inside a home, which Residential posits will permit DTE to monitor an individual's behavior within his or her residence, it cites no evidence to support this assertion. Reliance on hypothetical or speculative injuries is insufficient to establish a constitutionally-based claim of injury. See *Mich Ed Ass'n v Superintendent of Pub Instruction*, 272 Mich App 1, 7; 724 NW2d 478 (2006) ("Mere hypothetical or conjectural injuries do not satisfy the constitutional requirements for standing.").

## IV. COST BASIS – OPT-OUT CHARGES

Residential argues that the MPSC's orders continuing the opt-out program surcharges are unlawful and unreasonable because they are improperly reliant on prior MPSC rulings and do not comply with the substantial evidence test. According to Residential, the imposition of these surcharges results in duplicative charges on opt-out customers. Further, while DTE failed to present a qualified witness to substantiate its position that customers opting out of the smart meter program are causing additional costs to DTE, Residential's expert testified that the opt-out customers did not increase DTE's expenses and that the surcharges could be entirely eliminated if DTE would permit customers to self-report their monthly electrical usage.

DTE's opt-out fees were initially set in MPSC Case No. U-17053. In that case, the MPSC's order explained:

> DTE Electric indicated that the proposed $87 initial fee to disable the transmitting capability of the meter has three components: (1) $61 for the time and expense of disabling the meter, including wage and transportation costs; (2) $2 for one hour of training for the employees who will carry out the disabling of the meter; and (3) $24 for billing system modifications. The proposed $15 monthly fee includes the operational costs of the [opt-out program (OP)], including costs to manually read the meters. Participants in the OP will receive credits of $0.45 and $0.15 per meter for the AMI and meter reading costs included in current rates set in Case No. U-16472. . . . The amount of each fee is also based on the company's estimate that 4,000 customers will elect to participate in the OP. . . . To arrive at this number, DTE Electric took the 1,100 expressions of customer concern that the company has received since the pilot program began and divided that number by the 722,000 installations completed as of the date of the application, and multiplied the result by the total number of customers (2,100,000), to arrive at 3,200, which was rounded up to 4,000. This equates to 0.2% participation in the OP. . . . DTE Electric indicated that this falls within the 0.002% to 0.4% range of opt-out participation experienced by utilities in other states that are further along in the process. [*In re Application of Detroit Edison Company to Implement Opt Out Program*, order of the Michigan Public Service Commission, entered May 15, 2013 (Case No. U-17053), pp 3-4.]

The MPSC Staff agreed with DTE's "method for calculating the proposed fees based on cost of service principles, but disagreed with the number of participants." *Id*. at 4. The Staff estimated that 15,500 customers would participate in the program, which would yield "an initial fee of $67.20, and a monthly fee of $9.80." *Id*. By the time the matter reached a decision by the

administrative law judge, over 3,200 customers had expressed concerns with the program. *Id*. at 7. This indicated that DTE's estimate was too low, and as such, the administrative law judge advocated adoption of the Staff's recommendation. *Id*. The MPSC concurred, explaining: "

> While DTE Electric's method of calculation is conservative (in that it considers every expression of concern to result in a decision to opt out), such expressions appear to be on the rise as the program expands, and the Staff's proposed participation rate is more credible. Real world experience will help with refining this calculation in the future; for the present the Commission . . . adopts the Staff's number . . . ." [*Id*. at 18.[3]]

The amount charged to those opting out of DTE's smart meter program was also examined in MPSC Case No. U-17767. In that case, the MPSC's order states the following relevant conclusions:

> The Commission agrees with [Residential] that no new formal cost of service study (COSS) or other cost support was introduced in this rate case to justify the current opt-out program charges. This fact is not disputed. However, the Commission also agrees with DTE Electric and the Staff that ample cost support was presented regarding the approved charges in Case No. U-17053. According to *Pennwalt Corp*[, 166 Mich App] at 9, the Commission may rely on that evidence and the Commission's previous determinations regarding those surcharges in this case in the absence of new evidence of a change in circumstances that would necessitate a reconsideration. It is worth noting that Case No. U-17053 was a contested case proceeding that met the requirements of the Michigan Administrative Procedures Act of 1969, MCL 24.201 *et seq*. (APA), and satisfies due process concerns such as notice and an opportunity to be heard. Many utility customers intervened in Case No. U-17053 and [Residential] could also have intervened. Further, the fact that the Court of Appeals affirmed the Commission's approval of DTE Electric's opt-out program and charges further assures the Commission that its decision in Case No. U-17053 is supported by competent, material, and substantial evidence on the whole record. Here, in the absence of new evidence or evidence of a change in circumstances, the Commission concludes that the current opt-out charges are appropriate and supported by the record evidence supplied in Case No. U-17053. The Commission also agrees with the PFD [proposal for decision] and adopts the Staff's proposal recommending a review of the utility's opt-out charges in either its next rate case or six months after the completion of AMI meter installation,

---

[3] We note that the MPSC's order was appealed, and this Court affirmed. *In re Application of Detroit Edison Co to Increase Rates*, unpublished per curiam opinion of the Court of Appeals, issued February 19, 2015 (Docket Nos. 316728, 316781). While several challenges were made in that case, none directly challenged the method of calculating the opt-out fee or the evidence supporting the calculation.

whichever occurs first. [*In re Application of DTE Electric Co to Increase Rates*, order of the Michigan Public Service Commission, December 11, 2015 (Case No. U-17767), pp 97-98.]

* * *

With respect to [Residential's] claim that the opt-out charges are duplicative, the Commission disagrees. [Residential] has failed to present any evidence supporting this assertion. Moreover, in Case No. U-17053, the Commission approved the current opt-out surcharges which include a credit that ensures opt-out customers are not also paying for the AMI program. Because the costs associated with opting out and the amount of the credit opt-out customers receive to avoid funding the AMI program were already vetted in Case No. U-17053, the Commission concludes that this argument lacks merit. Further, although [Residential] is correct that no cost support was introduced in this case regarding the AMI credits included in the calculation of the current opt-out fees, this fact is not dispositive and does not require the Commission to waive or reduce the already approved and affirmed AMI opt-out charges. [*Id*. at 100.]

In this appeal, Residential again argues that the opt-out charges should be eliminated. Residential first contends that there was no evidence presented in the current proceeding supporting the amount of the fees. The reason for this failure is simple: DTE was not seeking to alter the opt-out fees, which had been set in Case No. U-17053. As the MPSC has explained before, there is no need for the MPSC to take new evidence on an issue that has been decided previously, absent a showing that circumstances have somehow changed. *In re Consumers Energy Co App*, 322 Mich App at 493-494. See also *Pennwalt Corp*, 166 Mich App at 9. Further, Residential is incorrect when it contends that opt-out customers are charged both to opt out of the smart meter program and for the costs of implementing the smart meter program. As the MPSC previously explained, opt-out customers are given credits to ensure that they do not incur duplicative charges for the costs of the smart meter program. *In re Application of DTE Electric Co to Increase Rates*, order of the Public Service Commission, entered December 11, 2015 (Case No. U-17767), p 100.

While *In re Consumers Energy Co App*, 322 Mich App at 494-496, dealt with Residential's challenges to Consumers' opt-out fees, we note that this Court similarly found it appropriate for the MPSC to rely on its prior decisions that initially set the opt-out fee where no relevant changes in the circumstances were shown. The instant matter concerns DTE's opt-out fees, but the analysis is essentially the same. Because the reasonableness of the fees were established in a prior case, there is no need for the MPSC to continually revisit the question absent any relevant changes in the circumstances. See *id*.

Residential's suggestion that the fees could be eliminated or substantially reduced by allowing customers to read their own meter's electrical usage, save for one annual reading each year by DTE, lacks merit. Residential relies on Commission Rule 114, which is codified as Mich Admin Code, R 460.114:

A utility shall provide residential and nonresidential customers with the opportunity to read and report energy usage provided that the customer accurately reports energy usage on a regular basis. A utility shall provide postage-paid, pre-addressed postcards for this purpose upon request, or the utility may permit customers to report meter readings on a secure company website, by telephone, or other reasonable means. At least once every 12 months, a utility shall obtain an actual meter reading of energy usage to verify the accuracy of readings reported in this manner. *Notwithstanding the provisions of this rule, a utility company representative may read meters on a regular basis.* [Emphasis added.]

Residential contends that DTE should be required to allow opt-out customers to self-read and report their usage because the rule permits a utility company to allow such a method of reporting energy consumption. While it would certainly be permissible for DTE to permit opt-out customers to report their energy usage on a monthly basis, as the MPSC aptly recognized, DTE nonetheless retains the statutory authority to read the meters on a regular basis. Residential's proposal essentially amounts to a request that the MPSC control DTE's decision with regard to meter reading in a situation where DTE has been given discretion by the MPSC's own rules. The MPSC cannot control or dictate DTE's management decisions. *Union Carbide Corp*, 431 Mich at 148. In addition, the present case is not a rulemaking proceeding. While the MPSC may have the ability to create rules and regulations "for the conducting of the business of public utilities," MCL 460.55, that authority is not implicated in this case, see *Union Carbide Corp*, 431 Mich at 152 (distinguishing between the PSC's authority to act in a rate case as opposed to a rulemaking proceeding).

The only change in circumstances that have been demonstrated as implementation of the smart meter program has progressed is that the number of customers choosing to opt out of the program is substantially fewer than what the MPSC anticipated when the opt-out fees were initially determined and set. This change would only lead to an increase in the opt-out rates. But DTE has not requested a rate increase at this point in time, instead asking the MPSC to delay any such decision until the program is fully implemented and the number of opt-out customers is definitively established. The MPSC's adoption of DTE's suggested approach was lawful and reasonable, and thus subject to affirmance.

## V. RETROACTIVE RATEMAKING

Residential argues that the MPSC, relying on its earlier decision in Case No. U-17767, erred when the MPSC rejected Residential's claim that DTE should not be permitted to recover expenses arising from income taxes incurred in 2012 because it constitutes retroactive ratemaking.

"MCL 460.556 provides the [M]PSC with the power to prescribe uniform methods of keeping accounts for electric utilities." *Attorney General v Pub Serv Comm*, 262 Mich App 649, 651; 686 NW2d 804 (2004). Retroactive ratemaking, however, is not permitted. *Id*. at 655-656. "Retroactive ratemaking . . . involves a change either upward or downward in the rates charged by a utility for its services under a lawful order. . . ." *Id*. at 657, citing *Detroit Edison Co v Pub Serv Comm*, 221 Mich App 370, 375-376; 562 NW2d 224 (1997). Rather, "rates are set in the commission's legislative capacity, and therefore must be construed like statutes and only be

given prospective effect." *Pub Serv Comm*, 262 Mich App at 655. As discussed by our Supreme Court in *Detroit Edison Co v Pub Serv Comm*, 416 Mich 510, 523; 331 NW2d 159 (1982), "the essential principle of the rule against retroactive ratemaking is that when the estimates [of costs on which rates are based] prove inaccurate and costs are higher or lower than predicted, the previously set rates cannot be changed to correct for the error; the only step that the MPSC can take is to prospectively revise rates in an effort to set more appropriate ones." Retroactive ratemaking does not occur where no adjustments are made to previously set rates, and instead, "only future rates [are] affected." *Pub Serv Comm*, 262 Mich App at 658. When it comes to ratemaking, deferred expenses are not considered past expenses; rather, once "expenses [are] deferred, they [become] expenses incurred in the year to which they were deferred." *Id*.

The MPSC has previously approved the accounting methodology[4] used by DTE in MPSC Case No. U-16864 to account for deferred federal and state income taxes, wherein it ordered:

> "Regulated utilities shall apply the Commission's policy for deferral accounting and full normalization ratemaking to the recent state and federal law changes, as delineated in the February 8, 1993 order in Case No. U-10083, over a period reasonably related to the reversal of the underlying book-tax basis differences. [*In the matter on the Commission's Own Motion to Seek Comments for Deferred Accounting Treatment for the Remeasurement of Deferred Tax Balances*, order of the Michigan Public Service Commission, entered February 15, 2012 (Case No. U-16864), p 3.]

Similarly, in MPSC Case No. U-10083, the MPSC found the accounting method DTE proposed to use in the current case to be not only acceptable but also preferable, stating:

---

[4] This Court also observed in *In re Application of DTE Electric Co to Increase Rates*, unpublished per curiam opinion of the Court of Appeals, issued February 13, 2018 (Docket Nos. 331599, 331868, 332159), p 8, with respect to the precise issue raised in this appeal:

> The city of Detroit increased its corporate tax rate from 1% to 2%, effective January 1, 2012. DTE's tax witness testified that the PSC had allowed amortization of deferred balances in previous cases, and that DTE was requesting similar treatment in this case. The PSC found that the requested treatment did not constitute retroactive ratemaking, and noted that DTE's request was consistent with accounting treatment authorized in prior PSC cases.

> We conclude that the PSC's decision to allow DTE to amortize payments associated with the tax did not constitute retroactive ratemaking. By definition, retroactive ratemaking occurs when the PSC, absent specific legislative authority, changes a rate established in a previous order. [Citations omitted.]

Although the case is unpublished and, therefore, not binding authority on this Court, MCR 7.215(C)(1), we find that the ruling applies to the present appeal.

Deferred tax accounting better matches book revenues and expenses to their related tax effects. It thus better reflects the financial results of the companies' operations and assigns to the same ratepayers the costs and benefits of the items for which deferred tax accounting is used, which promotes intergenerational equity. Deferred tax accounting is not harmful to ratepayers. . . . [T]he Commission has granted most requests for deferred tax accounting and has granted many requests for continuing authority. . . .

\* \* \*

With respect to generally accepted accounting principles, . . . deferred tax accounting is the preferred accounting for taxes, even if the relevant accounting standards have permitted an exception for regulatory agencies to require flow-through accounting. Deferred tax accounting also promotes rate stability because it eliminates distortions due to fluctuations in book/tax-timing differences. [*In the matter on the Commission's Own Motion to Examine the Provisions of the Uniform Systems of Accounts for Electric and Gas Utilities Related to Deferred Income Tax Accounting*, Michigan Public Service Commission Order, entered February 8, 1993 (Case No. U-10083), p 5.]

It has been recognized that the amortization of expenditures "becomes a current expense even though it reflects expenditures that were . . . in the past," and as such "amortization does not constitute retroactive ratemaking." *Assoc of Businesses Advocating Tariff Equity (ABATE) v Public Serv Comm*, 208 Mich App 248, 261; 527 NW2d 533 (1994) (citation omitted). Thus, the deferred taxes pertinent to DTE in this matter are not considered a past expense for purposes of ratemaking. Because of their deferral, they are treated as a current expense subject to amortization. *Pub Serv Comm*, 262 Mich App at 658.

Residential briefly contends that the MPSC's decision should be reversed because the amount DTE seeks to recover for the deferred taxes will be covered by a different line item, one that takes into account the federal, state, and local taxes DTE expected to incur. Residential conflates the expense at issue, which is a deferred tax from an earlier year, with taxes that were anticipated to be incurred for the projected test year. These are different expenses and must be treated as such.

We affirm.

/s/ Mark J. Cavanagh
/s/ Jane E. Markey
/s/ Anica Letica

-10-