*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* APPLICATION OF INDIANA MICHIGAN POWER COMPANY TO INCREASE RATES.

---

INDIANA MICHIGAN POWER COMPANY,

        Petitioner-Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION
and ASSOCIATION OF BUSINESSES
ADVOCATING FOR TARIFF EQUITY,

        Appellees.

FOR PUBLICATION
August 13, 2019
9:00 a.m.

No. 343767
Public Service Commission
LC No. 00-018370

---

Before: LETICA, P.J., and M. J. KELLY and BOONSTRA, JJ.

BOONSTRA, J.

Petitioner appeals by right the April 12, 2018 order of the Public Service Commission (PSC) authorizing petitioner to adopt a rate increase. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The issues in this case arise following the enactment of 2016 PA 341, sometimes informally called "Act 341," through which the Legislature amended the PSC's enabling act, MCL 460.1 *et seq.*[1] The PSC's April 12, 2018 order includes a concise summary of the proceedings leading to the decision below:

---

[1] The amendments included the addition of MCL 460.6w, in furtherance of this state's resolve to encourage both competition and alternative energy sources in the provision of electricity, while guaranteeing reliability of service. We will discuss that provision in greater detail later in this opinion.

On May 15, 2017, [petitioner] filed an application seeking authority to increase its rates for the sale of electric energy, approval of depreciation accrual rates, and other related matters. The rate increase sought in this proceeding is based on the company's projections for relevant items of investment, expenses, and revenues for a test year covering the calendar year ending December 31, 2018. In its application, [petitioner] averred that, without rate relief, the company will experience a jurisdictional electric revenue shortfall of $51,700,000, on an annual basis, during the test year.

\* \* \*

According to [petitioner], the net impact of all matters to be considered in this proceeding supports the company's requested rate relief of $51,700,000. The company maintained that, absent rate relief in this amount, it will experience revenues so low as to deprive it of a reasonable return on its investments in violation of the federal and state constitutions.

Administrative Law Judge Mark E. Cummins (ALJ) held a prehearing conference on June 22, 2017. At the prehearing conference, the ALJ granted petitions to intervene filed by the Michigan Department of the Attorney General (Attorney General) and [the Association of Businesses Advocating for Tariff Equity (ABATE)]. The Commission Staff (Staff) also participated.

An evidentiary hearing was held on November 15, 2017, after which timely briefs and reply briefs were filed. On February 8, 2018, the ALJ issued his Proposal for Decision (PFD). The parties filed exceptions to the PFD on February 26, 2018, and replies to exceptions on March 8, 2018.

The PSC granted petitioner's request for rate relief, but applied the "net CONE [Cost of New Entry]" methodology to adjust certain costs related to petitioner's provision of "capacity" services to customers who have chosen an alternative electric supplier. It therefore granted rate relief in the amount of $49,895,000.[2] The order granting the rate relief further specified that the new rates would go into effect two weeks after the order was entered.

This appeal followed. On appeal, petitioner challenges two aspects of the PSC's order: (1) the two-week delay in implementation; and (2) the use of the CONE methodology. This Court granted the motion of the Michigan Electric and Gas Association (MEGA) to file a brief as amicus curiae.[3]

---

[2] This April 12, 2018 order authorized a rate increase in the amount of $49,118,000, but an April 27, 2018 amendatory order corrected the amount of the rate increase to $49,895,000.

[3] See *In re Application of Indiana Mich Power Co to Increase Rates*, unpublished order of the Court of Appeals, entered December 17, 2018 (Docket No. 343767).

## II. STANDARD OF REVIEW

This Court's standard of review for PSC orders is narrow and well defined. Under MCL 462.25, "[a]ll rates, fares, charges, classification and joint rates fixed by the [PSC] and all regulations, practices, and services prescribed by the [PSC]" are presumed to be lawful and reasonable. See also *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A reviewing court should defer to the PSC's administrative expertise in reviewing an order setting rates, and should not substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). However, a final order of the PSC must be authorized by law and must be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Consumers Energy Co*, 279 Mich App 180, 188; 756 NW2d 253 (2008). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999).

Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003). This includes issues of statutory interpretation. *In re Complaint of Rovas*, 482 Mich 90, 102; 754 NW2d 259 (2008). We give an administrative agency's interpretation of relevant statutes respectful consideration, but not deference. *Id*. at 108.

## III. DELAYED IMPLEMENTATION OF NEW RATES

Petitioner and amicus MEGA argue that the PSC erred by ordering that the rate relief it granted in its April 12, 2018 order apply only to service provided on and after April 26, 2018, i.e., that the order essentially not take effect until that later date. We disagree.

MCL 460.6a(1) conditions changes in rates or rate schedules by regulated gas or electric utilities on PSC approval. MCL 460.6a(5) requires that the PSC make a "final decision with respect to a completed petition or application to increase or decrease utility rates within the 10-month period following the filing of the completed petition or application;" otherwise, "the petition or application is considered approved." That subsection further provides that where the petitioning utility "makes any significant amendment to its filing, the commission has an additional 10 months after the date of the amendment to reach a final decision, and also that "[i]f the utility files for an extension of time, the commission shall extend the 10-month period by the amount of additional time requested by the utility."

In this case, the parties stipulated to extend the 10-month period by 28 days, and the PSC entered its April 12, 2018 order granting rate relief precisely 10 months and 28 days after petitioner filed its petition, i.e., on the last day available for a timely decision under MCL 460.6a(5). Although that order, as adjusted by the April 27 amendatory order, substantially granted petitioner's request for a rate increase, it declared that petitioner "is authorized to implement the rates approved by this order on a service rendered basis for service provided on or after April 26, 2018." Petitioner argues that the two-week implementation delay

will cost it $1.9 million, to which it claims it is entitled, which amount petitioner arrived at by calculating the weekly average of the total annual increase and then doubling that value. Petitioner also argues that by delaying implementation of the new rates by two weeks, the PSC was attempting to extend the statutory period available for it to reach a decision, and that the April 12, 2018 order, as amended, should therefore not be considered a "final decision" for purposes of MCL 460.6a(5). The result would be that petitioner's original petition should be deemed approved as filed. Both arguments hinge on the extent to which the PSC may issue an order providing that some of its aspects would not go into effect immediately. We conclude that the PSC acted within its authority in this case.

## A. COLLATERAL ATTACK

Before addressing the issues raised by petitioner, we must first address the PSC's contention that petitioner's claim is an impermissible collateral attack on the PSC's earlier decision in *In the Matter, on the Commission's Own Motion, to Revise the Standard Rate Application Filing Forms and Instructions* (Case No. U-18238). In that case, the PSC undertook to reevaluate its standard filing requirements for rate cases following the enactment of Act 341. Among the issues considered was whether the PSC could give rates an effective date other than the date on which the rates were approved. In a footnote of a July 31, 2017 order, the PSC stated:

> MCL 460.6a(5) states that the Commission must "*reach* a *final decision* . . . within the 10-month period following the filing of [a] completed petition or application . . . .*" (Emphasis added.) As a result, based on the Commission's legal interpretation of this directive, the Commission finds that an order settling the rights of the parties and disposing of all issues in controversy in a rate case, aside from enforcement of that decision (i.e., the issuance of tariff sheets, determining the appropriate rate design, etc.), will, at the very least, be issued by the Commission within 10 months. . . . The Commission further finds that the distinction between the Legislature's use of the words "reach a final decision" versus "issue a final order," the latter of which is, in fact, used in a different context elsewhere within MCL 460.6a, also provides additional support for the Commission's interpretation. [Case No. U-18238, Order Summarizing Investigation and Partially Closing Docket, p 6 n 8 (Footnote 8).

In other words, the PSC distinguished between issuing a final decision and implementing that decision, and concluded that it did not need to implement a decision within the time frame within which the decision itself needed to be made. The Michigan Electric and Gas Association (MEGA) and Consumers Energy Company (Consumers) filed petitions seeking rehearing and clarification of the PSC's language in Footnote 8, resulting in the PSC's issuance of an order clarifying that statement on October 11, 2017. See Case No U-18238, order entered October 11,

2017.[4] Neither MEGA nor Consumers further challenged or appealed the October 11, 2017 order.

A collateral attack occurs when a party uses "a second proceeding to attack a tribunal's decision in a previous proceeding." *Worker's Compensation Agency Director v MacDonald's Industrial Prods, Inc (On Reconsideration)*, 305 Mich App 460, 474; 853 NW2d 467 (2014). A "collateral attack" on a previous decision is generally impermissible; a party aggrieved by a decision in an earlier proceeding instead has resort to the appellate process in the context of that same proceeding. See *id.* at 475. Only decisions that are void for lack of subject matter or personal jurisdiction may be collaterally attacked. *Id.* The PSC argues that, because petitioner did not raise any objections in connection with the orders in Case No. U-18238, and did not appeal the PSC's conclusions in Footnote 8, petitioner should be precluded from attacking in this case the PSC's determination that a timely final decision may include a provision for delayed implementation of its terms. In the context before us, we disagree.

The PSC acknowledges that Case No. U-18238 was not a contested rate case; instead, it was a unilateral revisiting by the PSC of certain of its procedures in the wake of the passage of Act 341. Although the PSC's decision in that case was issued with an extensive distribution list, which included petitioner, it did not actually decide any rights or responsibilities of petitioner or any other entity. Footnote 8 of that decision, and the PSC's later clarification of it, merely asserted in the abstract that the PSC believed it was able to delay implementation of a final decision in a ratemaking case. In fact, the PSC itself calls Case No. U-18238 a "case with no monetary impact" on petitioner and one in which "the stakes were low compared to a rate case with tens of millions of dollars at stake." At the time the orders in Case No. U-18238 were entered, petitioner was not a party to the case whose rights were being adjudicated, but rather was merely invited to submit comments or objections as an interested person; moreover, petitioner was not "aggrieved" by the PSC's abstract statement of law found in Footnote 8 (and the later clarification), see *Worker's Compensation Agency Director (On Reconsideration)*, 305 Mich App at 475, and it is far from clear that petitioner would have possessed standing to take an appeal from the PSC's orders in that case. See MCR 7.203(A), (B). Under these circumstances, we conclude that the collateral attack doctrine does not bar petitioner's claim relating to delayed implementation.

The PSC further argues that, if the collateral attack doctrine does not apply, this Court should nonetheless apply some form of issue preclusion to bar petitioner's claim in the manner of a claim barred by collateral estoppel. We disagree.

---

[4] In its October 11, 2017 order, the PSC referred to an earlier case in which its final order was issued 8 days after its final decision, clarifying that "footnote 8 was intended to be transparent in notifying stakeholders that the Commission plans on having the preparation, review, and approval of final tariff sheets conforming to the Commission's final decision handled in an expeditious manner after the issuance of the final decision."

"Collateral estoppel bars relitigation of an issue in a new action arising between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding." *Leahy v Orion Twp*, 269 Mich App 527, 530; 711 NW2d 438 (2006), citing 1 Restatement Judgments, 2d, § 27, p 250. However, this Court has noted, and the PSC concedes, that "ratemaking is a legislative, rather than a judicial, function, and thus the doctrines of res judicata or collateral estoppel 'cannot apply in the pure sense.'" *In re Application of Consumers Energy Co for Rate Increase*, 291 Mich App 106, 122; 804 NW2d 574 (2010) (quotation marks and citation omitted). Our Supreme Court has also noted that courts are reluctant to apply preclusion doctrines when questions of law are involved and the causes of action do not arise from the same subject matter or transaction. *Young v Edwards*, 389 Mich 333, 339; 207 NW2d 126 (1973). Further, "A question has not been actually litigated until put into issue by the pleadings, submitted to the trier of fact for a determination, and thereafter determined." *VanDeventer v Mich Nat'l Bank*, 172 Mich App 456, 463; 432 NW2d 338 (1988).

As noted, Case No. U-18238 was not a contested rate case, and did not actually decide any rights or responsibilities of any party. Footnote 8 (and the later clarification) merely asserted as an abstract legal proposition, and without applying the conclusion to any set of facts, that the PSC was able to delay implementation of a final decision in a ratemaking case. The mere fact that no utility elected to expend resources to challenge that footnoted statement (beyond the clarification given by the PSC) does not mean that the issue was actually litigated. *Id*. We decline to apply preclusion principles to petitioner's claim in this case.

Accordingly, although the question of the PSC's prerogative to issue a final order that includes some delay in its implementation was abstractly addressed in Case No. U-18238, we conclude that petitioner's claim in this case is not an impermissible collateral attack on the PSC's decision in that earlier case. Further, the matter was not fully litigated in that case, and collateral estoppel would not apply in this situation even if the doctrine were fully applicable in this appeal of a ratemaking order. Accordingly, petitioner is not precluded from raising this issue.

## B. FINAL DECISION

Notwithstanding that petitioner is not precluded from raising this issue, we conclude that the PSC was permitted to issue a final decision with delayed implementation in this case. Petitioner argues that the PSC erred by purporting to issue a final decision in the form of an order approving rate relief while delaying implementation of the new rates by two weeks. We disagree.

Resolution of this issue requires us to interpret the language of MCL 460.6a(5). When interpreting a statute, our goal is to ascertain and give effect to the intent of the Legislature. *Mich Ed Ass'n v Secretary of State* (*On Rehearing*), 489 Mich 194, 217; 801 NW2d 35 (2011). Our starting point is the language of the statute itself. *United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n* (*On Rehearing*), 484 Mich 1, 13; 795 NW2d 101 (2009). The Legislature is presumed to have intended the meaning it plainly expressed, *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012), and clear statutory language must be enforced as written, *Velez v Tuma*, 492 Mich 1, 16-17; 821 NW2d 432 (2012); *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011).

MCL 460.6a(5) provides:

Except as otherwise provided in this subsection and subsection (1), if the commission fails to reach a final decision with respect to a completed petition or application to increase or decrease utility rates within the 10-month period following the filing of the completed petition or application, the petition or application is considered approved. If a utility makes any significant amendment to its filing, the commission has an additional 10 months after the date of the amendment to reach a final decision on the petition or application. If the utility files for an extension of time, the commission shall extend the 10-month period by the amount of additional time requested by the utility.

The plain language of MCL 460.6a(5) provides that the PSC must "reach a final decision" on a petition or application within the prescribed time frame; it does not say that any increase or decrease in utility rates ordered in response to that petition or application must be fully implemented within that time frame. As discussed below, we conclude that a significant difference exists between a "final decision" and the ultimate implementation of that decision, such that the phrase "final decision" cannot reasonably be read to encompass full implementation.

As stated earlier in this opinion, and while not binding on our statutory interpretation, the PSC in Footnote 8 of its July 31, 2017 order in Case No. U-18238 cited *Black's Law Dictionary* (7th ed, 1999) and distinguished "final decision" from "final order," stating that a "final decision" from the PSC is "an order settling the rights of the parties and disposing of all issues in controversy in a rate case, aside from enforcement of that decision." In its October 11, 2017 order, the PSC reaffirmed its conclusion that the terms "final decision" and "final order" have different meanings, noting that "[p]er *Black's Law Dictionary*, 'final decision' is defined as '[a] court's last action that settles the rights of the parties and disposes of all issues in controversy, except for the award of costs (and, sometimes, attorney's fees) and enforcement of the judgment,' whereas 'final order' is defined as '[a]n order that is dispositive of the entire case.' " These definitions recognize a difference between finality in the decision-making process and finality in implementation of that decision.

Although our court rules do not distinguish "final decision" from "final order," they do define a "final order" appealable by right as, but for exceptions not applicable here, "the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties." MCR 7.202(6)(a)(i). And, when considering the question of "finality" for purposes of appealability, our Supreme Court has held that whether an order has "immediate and significant effect" is not dispositive of the question, and that there is "nothing inherently inconsistent with an order being 'final' . . . for one purpose and not another." *Great Lakes Steel v Pub Serv Comm*, 416 Mich 166, 180; 330 NW2d 380 (1982).

In light of this, we conclude that the PSC's April 12, 2018 order was a "final decision" within the meaning of MCL 460.6a(5). Moreover, the statutory obligation was for the PSC to reach a "final decision" within the prescribed time frame, not that its decision regarding rate relief must be fully implemented within that time frame. If the Legislature had intended that the PSC's decision on a petition or application be fully implemented by the time frame prescribed in

MCL 460.6a(5), it could have easily said so; we will not read such a requirement into the clear language of the statute. See *Mich Ed Ass'n*, 489 Mich at 218. The PSC was not required to treat petitioner's petition as accepted merely because it entered an order granting rate relief that would not take immediate effect.

## C. CONFISCATORY RATES

Petitioner also argues that, even if the PSC acted within its authority in delaying implementation of the requested rate relief, it was damaged by that delay and should be compensated for what it argues were two weeks of "confiscatory" rates. We disagree.

"A public utility has a right to a just and reasonable rate of return on its investment," and such utilities "are protected from being limited to rates that are confiscatory." *ABATE v Pub Serv Comm*, 208 Mich App 248, 269; 527 NW2d 533 (1994). As petitioner points out, our Supreme Court has stated that "[e]very day a warranted rate increase is withheld is a day in which justice has been denied . . . ." *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 637; 209 NW2d 210 (1973). However, *Mich Consol Gas Co* does not stand for the proposition that a decision recognizing a utility's entitlement to a rate increase must be given immediate effect in all circumstances.[5] Our Supreme Court has acknowledged that "[a] public utility has a substantive right, set forth in the statutes and rooted in the constitution, to rate relief where the revenue produced by an existing rate structure is less than the amount required by the statutes or the constitution,"[6] and that this includes "a right to immediate relief where compelling circumstances indicate that such relief is necessary." *Consumers Power Co v Pub Serv Comm*, 415 Mich 134, 145; 327 NW2d 875 (1982) (citations omitted). Although the Court in *Consumers Power Co* ultimately approved the circuit court's decision to grant a temporary injunction to allow immediate collection of higher rates in order to prevent irreparable harm to a utility determined to be entitled to such rate relief, *id*. at 154-156, the Court recognized the general principle that, absent compelling circumstances that demonstrate a utility's entitlement to immediate rate relief, "[t]he power to decide whether any rate relief should be provided and whether immediate relief shall be provided is vested in the commission." *Id*. at 145.

In this case, petitioner does not argue that Supreme Court's statements in *Consumers Power Co* concerning the PSC's prerogative to decide whether to grant immediate rate relief do not apply. Instead, petitioner simply states that "rate relief without delay" was "the practice that existed before the decision" in that case, and that it "remained the more common practice up

---

[5] The issue addressed in *Mich Consol Gas Co* was the constitutionality of a statutory limitation on judicial review of a PSC decision, and the Court in that case notably added the following qualifier to the above-quoted language, "unless judicial action, as in this case, can be taken." No such issue is present in this case.

[6] "Both the Michigan Constitution and the United States Constitution preclude the government from depriving a person of life, liberty, or property without due process of law." *Reed v Reed*, 265 Mich App 131, 159; 693 NW2d 825 (2005). See also US Const, Am XIV, § 1; Const 1963, art 1, § 17.

until now." Even if immediate rate relief is indeed "the more common practice," petitioner does not explain why the PSC should have been required to follow that practice in this particular instance.

Petitioner notes that under MCL 462.25, "[a]ll rates, fares, charges, classification and joint rates fixed by the commission and all regulations, practices and services prescribed by the commission shall be in force and shall be prima facie, lawful and reasonable until finally found otherwise in an action brought for the purpose . . ., or until changed or modified by the commission . . . ." However, nothing in the statutory language requires that a rate-relief order must require immediate implementation.

Petitioner argues that if we conclude that the PSC has the ability to delay implementation of rate relief it has granted, there is nothing to stop it in the future from exceeding the two-week delay at issue in this case and to prescribe delays of much longer periods. However, a utility affected by a delay in implementation remains free to argue that a particular delay is "arbitrary, capricious, or an abuse of discretion" under MCL 24.306(1). In this case, petitioner complains that the PSC offered no explanation for the two-week delay in question, but stops short of arguing that the lack of explanation rendered that delay arbitrary, capricious, or an abuse of discretion. Accordingly, the propriety of the reasons underlying the unexplained delay is not before this Court, nor does a delay of 14 days in implementing a decision that was 11 months in the making strike this Court as per se arbitrary, capricious, or an abuse of discretion.

Finally, appellee ABATE argues that petitioner's calculation that the two-week delay will cause it to in incur a $1.9 million shortfall in revenue is speculative. We agree. Petitioner cannot state with certainty at this juncture, merely because it *could have* collected a higher rates for those two weeks if the PSC had ordered immediate implementation, that its inability to do so would cause an actual shortfall of a particular amount, or that the delay in implementation would deny it a "just and reasonable rate of return on its investment," *ABATE*, 208 Mich App at 269. We agree with ABATE that the delay at issue cannot necessarily be equated with a $1.9 million shortfall in revenue. Moreover, we cannot conclude that the two-week implementation delay necessarily imposes confiscatory rates in the interim.[7]

For these reasons, we hold that the PSC did not exceed its authority by including within its April 12, 2018 order granting rate relief, as amended, a two-week delay in implementation.

## IV. METHODOLOGY FOR CALCULATING CAPACITY COSTS

Petitioner also argues that the PSC erred by applying the "net CONE" methodology to calculate the capacity costs that petitioner was entitled to recoup. We disagree.

---

[7] The PSC notes that "although [it] found a rate increase appropriate to account for planned capital investments and increasing operating expenses," it "never suggested that [petitioner's] existing rate was confiscatory or lower than the lowest reasonable rate."

MCL 460.6a(4) authorizes the PSC to establish procedures for considering and deciding utilities' petitions to raise rates, and requires the PSC to "authorize a utility to recover the cost of fuel, purchased gas, or purchased power only to the extent that the purchases are reasonable and prudent." The statute does not specify how the PSC is to determine a utility's costs, or what is reasonable and prudent, and so this Court has generally deferred to the PSC's decisions concerning such methodology. See *Attorney General v Pub Serv Comm*, 262 Mich App 649, 655, 658; 686 NW2d 804 (2004). "The PSC is entitled to consider 'all lawful elements' in determining rates . . . ." *Detroit Edison Co v Pub Serv Comm*, 221 Mich App 370, 385; 562 NW2d 224 (1997), citing MCL 460.557(2); MCL 460.6a(2). Further, "[t]he PSC is not bound by any single formula or method and may make pragmatic adjustments when warranted by the circumstances." *Detroit Edison*, 221 Mich App at 375.

An "alternative electric supplier" (AES) is an entity other than a public utility selling electric generation service to retail customers. MCL 460.10g(1)(a). "Capacity obligations" refers to an electric provider's duty to ensure that it has the means to provide electricity to its customers "as set by the appropriate independent system operator, or commission." MCL 460.6w(8)(a). Although some consumers in this state have the option of obtaining electricity from an AES, petitioner remains obligated to make available its transmission and distribution facilities for that purpose, and also retains a role in ensuring that AESs have sufficient capacity to consistently meet their customers' needs. Because petitioner incurs costs related to these AES customers, it is permitted to incorporate a "capacity charge" into its rates.

At issue in this dispute is whether the PSC correctly calculated the capacity charge to include costs that petitioner was entitled to recover while excluding charges that are a not recoverable by means of a capacity charge. MCL 460.6w sets forth provisions intended to ensure that electric suppliers maintain sufficient capacity to meet their customers' needs consistently. MCL 460.6w(3) directs the PSC to establish a capacity rate to be applied to alternative electric load, and, in order to "ensure that noncapacity electric generation services are not included in the capacity charge," requires the PSC to "include the capacity-related generation costs included in the utility's base rates, surcharges, and power supply cost recovery factors," and "subtract all non-capacity-related electric generation costs . . . ." See MCL 460.6w(3)(a), (b).

We do not read this language as mandating the use of "actual costs" according to the method proposed by petitioner. Moreover, as ABATE notes, it is not clear that MCL 460.6w even applies to petitioner inasmuch as it appears on its face only to apply to tariffs established under the Midcontinent Independent System Operator (MISO), a Regional Transmission Organization (RTO) that operates as an alternative to PJM Interconnection, LLC (PJM), which is the RTO within whose jurisdiction petitioner operates. See, e.g., MCL 460.6w(12)(a) (defining "[a]ppropriate independent system operator" to mean MISO). Indeed, MCL 460.6w(11) expressly states,

> Nothing in this act shall prevent the [PSC] from determining a generation capacity charge under the reliability assurance agreement, rate schedule FERC No. 44 of the independent system operator known as PJM Interconnection, LLC, as approved by the Federal Energy Regulatory Commission in docket no. ER 10-2710 or similar successor tariff.

-10-

Accordingly, the PSC's April 12, 2018 order in this case indicated that the PSC "agrees with [petitioner] that nothing in Act 341 requires that [petitioner's] capacity rate be set using the mechanism set forth in the statute." Rather, the PSC concluded that "subsections (a) and (b) of Section 6w(3) provide guidance . . . for determining capacity costs and rates."

Petitioner does not contest this reading of the statute, but instead argues that MCL 460.11 in any event "requires the [PSC] to set rates based on cost of service." MCL 460.11 states that, but for exceptions not here applicable, the PSC "shall ensure the establishment of electric rates equal to the cost of providing service to each customer class," and sets forth a methodology for making such calculation while providing that the PSC "may modify this method if it determines that this method of cost allocation does not ensure that rates are equal to the cost of service."

In considering petitioner's calculation of recoverable capacity charges, the PSC expressed concern that petitioner's proposed methodology would include costs not actually related to capacity. The PSC determined, based on its staff's analysis, that the appropriate methodology was to "identify production costs and then only consider those corresponding to the cost of a [combustion-turbine plant] as capacity-related." The PSC further noted that its staff "contended that [petitioner] should be permitted to recover only the costs that are directly related to capacity service," which thus meant the "exclusion of some production-demand classified costs," and suggested that "the proper cost of capacity is the Cost of New Entry (CONE), or the cost to build a combustion turbine (CT)." The PSC quoted its staff in elaborating as follows:

> The characteristics of a CT are such that it effectively supplies only capacity. A CT is relatively expensive to run to produce energy, but relatively inexpensive to build. Therefore, it is only economically utilized to supply energy in those hours when load is at its highest. These hours are also those which are considered to set the capacity need of the utility to serve its customers. Plants other than CTs are more expensive to build and less expensive to run, making them the most cost-effective choice only if they run enough hours a year so that the total cost is lower. Therefore, the difference between the cost to build a CT and any other type of plant is the capital cost expended to produce lower energy costs. In Staff's opinion, this cost should properly be considered an energy cost. However, the net sales to the market should be applied as an offset to the capacity-related costs. As all energy is bid into the market at the cost to run a plant, but plants are paid if dispatched at the highest bid called in the supply stack, these net-energy market sales (imperfectly) capture what Staff would consider to be the energy related portion of capacity costs. Therefore, to remove all costs above a CT and then apply an offset which effectively, if imperfectly, does the same, would be double counting the offset.

Petitioner argues that the PSC's chosen methodology deviated from the requirement to base rates on actual costs. However, the record shows that the PSC recognized the problem of isolating the costs of providing capacity to AESs to ensure their reliability, which petitioner was entitled to recover, from ordinary operating costs. The PSC's chosen methodology was intended to address that issue. Again, we generally defer to the PSC regarding such decisions. See MCL 460.6a(4); *Attorney General*, 262 Mich App at 655.

-11-

Petitioner suggests that instead of resorting to the net CONE to calculate costs, the PSC should simply have stricken from petitioner's proposal any costs it deemed not properly part of the calculation and otherwise stayed with petitioner's approach. Even if petitioner's proposed methodology was a reasonable choice, it is the PSC's prerogative to choose among competing methodologies for such calculations. See MCL 460.6a(4); *Attorney General*, 262 Mich App at 655.

Petitioner protests that the use of net CONE constituted a departure from long prevailing precedent. Petitioner cites cases to show previously prevailing practice, but cites no authority for the proposition that the PSC, having once applied a methodology, does not have discretion to reconsider the matter in subsequent cases. Instead, petitioner asserts that the PSC offered no reason for the change, and thus that the use of net CONE was arbitrary and capricious. We disagree.

As stated, the PSC noted that, under MCL 460.6w(11), the PSC retained the prerogative of "determining a generation capacity charge," and also that "nothing in Act 341 requires that [petitioner's] capacity rate be set using the mechanism set forth in the statute." The PSC nonetheless took guidance from the direction in MCL 460.6w(3) that the PSC establish a capacity rate "to be applied to alternative electric load," and also to "ensure that noncapacity electric generation services are not included in the capacity charge" by requiring the PSC under Subdivision (a) to "include the capacity-related generation costs included in the utility's base rates, surcharges, and power supply cost recovery factors," and under Subdivision (b) to "subtract all non-capacity-related electric generation costs . . . ."

In this case, the PSC announced that it found it "appropriate to revisit the methodology" it had approved in an earlier case. It also set forth extensive explanations, including that not "all production capacity-related costs are incurred to provide capacity," and offered exhibits to show "that the rates calculated for [AES customers] and standard service customers using net CONE do not differ," in support of its conclusion that net CONE is reasonable because it "begins with total embedded production-related costs and subtracts non-capacity-related costs." The PSC also indicated that it "may revisit, in a future rate case, whether to retain this net CONE methodology" or revert to "using fixed costs offset by fuel and other revenues."

Our review of the record reflects that the issue of the appropriate methodology for determining capacity costs was extensively litigated in this case, was the subject of an extensive evidentiary record, including expert testimony, was thoroughly briefed by the parties, and was the subject of intense and detailed analysis by the PSC. In its order, the PSC presented at length the reasoning underlying its choice of methodology, and the problems it was attempting to address; its reasoning was not unlawful, unreasonable, or unsupported by evidence. For these reasons, petitioner has not shown that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment when it chose to employ the net CONE methodology for the purpose of separating petitioner's general operating costs from its costs in supplying capacity to AESs as required for the latter to guarantee their ability to meet their customers' needs at times of highest demand. Accordingly, we defer to that decision. *MCI Telecom Complaint*, 460 Mich at 427; *Attorney General*, 262 Mich App at 655.

Affirmed.

/s/ Mark T. Boonstra
/s/ Anica Letica
/s/ Michael J. Kelly